# EXHIBIT A



The Cincinnati Insurance Company ▪ The Cincinnati Indemnity Company
The Cincinnati Casualty Company ▪ The Cincinnati Specialty Underwriters Insurance Company
The Cincinnati Life Insurance Company

January 6, 2026

To Whom It May Concern:

I hereby certify that the attached Management Liability Policy, EMP-0726342, issued to The Relax Group, LLC, is a true and accurate copy of the original policy issued effective September 11, 2024.

Sincerely,

Jason Couch
Vice President
Management Liability & Surety Department

JC:jc

Attachment

# e-CLAS™ Banner Page

## Environment: PRODUCTION

**Policy Number:**    EMP 072 63 42

**Effective Date:**    09-21-2025

**Named Insured:**    THE RELAX GROUP, LLC

28-028

GALLAGHER BENEFIT SERVICES
INC
PO BOX 511
CONCORD NH 03302-0511

# The Cincinnati Insurance Companies

DATE: 09-21-2025

TO: GALLAGHER BENEFIT SERVICES INC 28-028

AGENCY CODE:  28-028

INSURED:  THE RELAX GROUP, LLC

POLICY/BOND NUMBER:  EMP 072 63 42

TRANSACTION #2

## CANCELLATION CREDIT MEMO

☐ CORRECTED

EFFECTIVE DATE OF CANCELLATION:  09/21/2025

☐ FLAT

☒ PRO RATA

**TOTAL RETURN PREMIUM DUE NOW $** 7,473

**(SUBSEQUENT INSTALLMENTS, IF ANY, ARE VOID)**

MANAGEMENT LIABILITY DEPARTMENT

09-23-2025 02:13

**NO 4087 DB 11 14**

**bates p. 003**

THE CINCINNATI INSURANCE COMPANY
P.O. BOX 145496
CINCINNATI OH 45250-5496

# NOTICE OF CANCELLATION OF INSURANCE

Named Insured & Mailing Address:

Producer: 28028

THE RELAX GROUP, LLC
PO BOX 21
NEWPORT NH 03773-0021

GALLAGHER BENEFIT SERVICES INC
PO BOX 511
CONCORD NH 03302-0511

Policy No.:  EMP0726342-00
Type of Policy:  MANAGEMENT LIABILITY COVERAGE – CLAIMS MADE
Date of Cancellation:  09/21/2025; 12:01 A.M. Local Time at the mailing address of the Named Insured.

We are cancelling this policy.  Your insurance will cease on the Date of Cancellation shown above.

The reason for cancellation is  Non-Payment of premium.

We have not received your payment of $670.00 that was due on 08/31/2025.

Direct bill charges may apply to your account due to cancellation for non-payment of premium and are not included in the amount shown above. If applicable, the charges will be billed on your next statement. Please see the Disclosure of Direct Bill Fees and Charges included with your account statements for additional information.

If you have already mailed your payment, we thank you. If not, we hope you will keep your insurance coverage in effect by sending payment so it can be processed prior to 09/21/2025 (Date of Cancellation, shown above). Otherwise, your policy will terminate at the date and time stated above. No further notice will be provided.

Your payment may be mailed to:
 • The Cincinnati Insurance Company, P.O. Box 145620,  Cincinnati, OH 45250-5620

Also, you can make your payment online at www.cinfin.com or by calling 800-364-3400.

If you choose to pay your premium online or over the phone, please note that payments confirmed prior to 3 p.m. Eastern Time are applied the same day. Payments made after 3 p.m. and not applied until the next day may not prevent your policy from cancelling. If your policy does cancel for non-payment of premium, reinstatement of coverage is solely at the discretion of the company.

Cancellation may be avoided if premium is paid in full prior to the date of cancellation shown above.

We will refund to you any unearned premium within 30 days from the date of cancellation or completed audit.

Named Insured

EMP 0190726342/NORTHEAST TERRITORY-2881641***
THE RELAX GROUP, LLC
PO BOX 21
NEWPORT NH 03773-0021

Date Mailed:
8th day of September, 2025

Matt Barton

877-942-2455 CORPORATE BILLING

FORM# CC96970104NH51995
ODEN 3.0.25.06a

Copy for Named Insured

NHCC5NONPMNT
**bates p. 004**052025MYNY
Page 1 of 1

THE CINCINNATI INSURANCE COMPANY
P.O. BOX 145496
CINCINNATI OH 45250-5496

Named Insured: THE RELAX GROUP, LLC                    Policy Number: EMP0726342-00

This page is separate and independent from the notice given.
We are informing you that the following parties were notified of this action.

**PARTIES NOTIFIED**

Named Insured
THE RELAX GROUP, LLC
PO BOX 21
NEWPORT NH 03773-0021

Producer
GALLAGHER BENEFIT SERVICES INC
PO BOX 511
CONCORD NH 03302-0511

THE CINCINNATI INSURANCE COMPANY
P.O. BOX 145496
CINCINNATI OH 45250-5496

# NOTICE OF CANCELLATION OF INSURANCE

Named Insured & Mailing Address:

THE RELAX GROUP, LLC
PO BOX 21
NEWPORT NH 03773-0021

Producer: 28028

GALLAGHER BENEFIT SERVICES INC
PO BOX 511
CONCORD NH 03302-0511

Policy No.:  EMP0726342-00
Type of Policy:  MANAGEMENT LIABILITY COVERAGE – CLAIMS MADE
Date of Cancellation:  09/21/2025; 12:01 A.M. Local Time at the mailing address of the Named Insured.

We are cancelling this policy.  Your insurance will cease on the Date of Cancellation shown above.

The reason for cancellation is  Non-Payment of premium.

We have not received your payment of $670.00 that was due on 08/31/2025.

Direct bill charges may apply to your account due to cancellation for non-payment of premium and are not included in the amount shown above. If applicable, the charges will be billed on your next statement. Please see the Disclosure of Direct Bill Fees and Charges included with your account statements for additional information.

If you have already mailed your payment, we thank you. If not, we hope you will keep your insurance coverage in effect by sending payment so it can be processed prior to 09/21/2025 (Date of Cancellation, shown above). Otherwise, your policy will terminate at the date and time stated above. No further notice will be provided.

Your payment may be mailed to:
 • The Cincinnati Insurance Company, P.O. Box 145620,  Cincinnati, OH 45250-5620

Also, you can make your payment online at www.cinfin.com or by calling 800-364-3400.

If you choose to pay your premium online or over the phone, please note that payments confirmed prior to 3 p.m. Eastern Time are applied the same day. Payments made after 3 p.m. and not applied until the next day may not prevent your policy from cancelling. If your policy does cancel for non-payment of premium, reinstatement of coverage is solely at the discretion of the company.

Cancellation may be avoided if premium is paid in full prior to the date of cancellation shown above.

We will refund to you any unearned premium within 30 days from the date of cancellation or completed audit.

Producer

EMP 0190726342/NORTHEAST TERRITORY-2881641***
GALLAGHER BENEFIT SERVICES INC
PO BOX 511
CONCORD NH 03302-0511

Date Mailed:
8th day of September, 2025

Matt Barton
877-942-2455 CORPORATE BILLING

FORM# CC96970104NH51995
ODEN 3.0.25.06a
Copy for Producer
NHCC5NONPMNT
bates p. 006 052025MYNY
Page 1 of 1

THE CINCINNATI INSURANCE COMPANY
P.O. BOX 145496
CINCINNATI OH 45250-5496

Named Insured: THE RELAX GROUP, LLC

Policy Number: EMP0726342-00

This page is separate and independent from the notice given.
We are informing you that the following parties were notified of this action.

**PARTIES NOTIFIED**

Named Insured
THE RELAX GROUP, LLC
PO BOX 21
NEWPORT NH 03773-0021

Producer
GALLAGHER BENEFIT SERVICES INC
PO BOX 511
CONCORD NH 03302-0511

THE CINCINNATI INSURANCE COMPANY
P.O. BOX 145496
CINCINNATI OH 45250-5496

# RESCISSION NOTICE

Named Insured & Mailing Address:

Producer: 28028

THE RELAX GROUP, LLC
PO BOX 21
NEWPORT NH 03773-0021

GALLAGHER BENEFIT SERVICES INC
PO BOX 511
CONCORD NH 03302-0511

Policy No.:   EMP0726342-00
Type of Policy:   MANAGEMENT LIABILITY COVERAGE – CLAIMS MADE

The CANCELLATION notice issued to be effective 08/20/2025 is hereby rescinded.

Named Insured

EMP 0190726342/NORTHEAST TERRITORY-2844874***
THE RELAX GROUP, LLC
PO BOX 21
NEWPORT NH 03773-0021

Date Mailed:
8th day of August, 2025

Matt Barton

877-942-2455 CORPORATE BILLING

NHCS5RSCN_C
**bates p. 008**062025MNNY
Page 1 of 1

FORM# CS01NH22006
ODEN 3.0.25.04a

Copy for Named Insured

THE CINCINNATI INSURANCE COMPANY
P.O. BOX 145496
CINCINNATI OH 45250-5496

Named Insured: THE RELAX GROUP, LLC                    Policy Number: EMP0726342-00

This page is separate and independent from the notice given.
We are informing you that the following parties were notified of this action.

**PARTIES NOTIFIED**

Named Insured
THE RELAX GROUP, LLC
PO BOX 21
NEWPORT NH 03773-0021

Producer
GALLAGHER BENEFIT SERVICES INC
PO BOX 511
CONCORD NH 03302-0511

THE CINCINNATI INSURANCE COMPANY
P.O. BOX 145496
CINCINNATI OH 45250-5496

# RESCISSION NOTICE

Named Insured & Mailing Address:

THE RELAX GROUP, LLC
PO BOX 21
NEWPORT NH 03773-0021

Producer: 28028

GALLAGHER BENEFIT SERVICES INC
PO BOX 511
CONCORD NH 03302-0511

Policy No.:    EMP0726342-00
Type of Policy:    MANAGEMENT LIABILITY COVERAGE – CLAIMS MADE

The CANCELLATION notice issued to be effective 08/20/2025 is hereby rescinded.

Producer

EMP 0190726342/NORTHEAST TERRITORY-2844874***
GALLAGHER BENEFIT SERVICES INC
PO BOX 511
CONCORD NH 03302-0511

Date Mailed:
8th day of August, 2025

Matt Barton

877-942-2455 CORPORATE BILLING

FORM# CS01NH22006
ODEN 3.0.25.04a

Copy for Producer

NHCS5RSCN_C
**bates p. 010**062025MNNY
Page 1 of 1

THE CINCINNATI INSURANCE COMPANY
P.O. BOX 145496
CINCINNATI OH 45250-5496

Named Insured: THE RELAX GROUP, LLC

Policy Number: EMP0726342-00

This page is separate and independent from the notice given.
We are informing you that the following parties were notified of this action.

**PARTIES NOTIFIED**

Named Insured
THE RELAX GROUP, LLC
PO BOX 21
NEWPORT NH 03773-0021

Producer
GALLAGHER BENEFIT SERVICES INC
PO BOX 511
CONCORD NH 03302-0511

THE CINCINNATI INSURANCE COMPANY
P.O. BOX 145496
CINCINNATI OH 45250-5496

# NOTICE OF CANCELLATION OF INSURANCE

Named Insured & Mailing Address:

THE RELAX GROUP, LLC
PO BOX 21
NEWPORT NH 03773-0021

Producer: 28028

GALLAGHER BENEFIT SERVICES INC
PO BOX 511
CONCORD NH 03302-0511

| | |
|---|---|
| Policy No.: | EMP0726342-00 |
| Type of Policy: | MANAGEMENT LIABILITY COVERAGE – CLAIMS MADE |
| Date of Cancellation: | 08/20/2025; 12:01 A.M. Local Time at the mailing address of the Named Insured. |

We are cancelling this policy.  Your insurance will cease on the Date of Cancellation shown above.

The reason for cancellation is  Non-Payment of premium.

We have not received your payment of $645.00 that was due on 07/31/2025.

Direct bill charges may apply to your account due to cancellation for non-payment of premium and are not included in the amount shown above. If applicable, the charges will be billed on your next statement. Please see the Disclosure of Direct Bill Fees and Charges included with your account statements for additional information.

If you have already mailed your payment, we thank you. If not, we hope you will keep your insurance coverage in effect by sending payment so it can be processed prior to 08/20/2025 (Date of Cancellation, shown above). Otherwise, your policy will terminate at the date and time stated above. No further notice will be provided.

Your payment may be mailed to:
 • The Cincinnati Insurance Company, P.O. Box 145620,  Cincinnati, OH 45250-5620

Also, you can make your payment online at www.cinfin.com or by calling 800-364-3400.

If you choose to pay your premium online or over the phone, please note that payments confirmed prior to 3 p.m. Eastern Time are applied the same day. Payments made after 3 p.m. and not applied until the next day may not prevent your policy from cancelling. If your policy does cancel for non-payment of premium, reinstatement of coverage is solely at the discretion of the company.

Cancellation may be avoided if premium is paid in full prior to the date of cancellation shown above.

We will refund to you any unearned premium within 30 days from the date of cancellation or completed audit.

Named Insured

EMP 0190726342/NORTHEAST TERRITORY-2841874***
THE RELAX GROUP, LLC
PO BOX 21
NEWPORT NH 03773-0021

Date Mailed:
7th day of August, 2025

*Matt Barton*

877-942-2455 CORPORATE BILLING

FORM# CC96970104NH51995
ODEN 3.0.25.04a

Copy for Named Insured

NHCC5NONPMNT
**bates p. 012**052025MYNY
Page 1 of 1

THE CINCINNATI INSURANCE COMPANY
P.O. BOX 145496
CINCINNATI OH 45250-5496

Named Insured: THE RELAX GROUP, LLC

Policy Number: EMP0726342-00

This page is separate and independent from the notice given.
We are informing you that the following parties were notified of this action.

**PARTIES NOTIFIED**

Named Insured
THE RELAX GROUP, LLC
PO BOX 21
NEWPORT NH 03773-0021

Producer
GALLAGHER BENEFIT SERVICES INC
PO BOX 511
CONCORD NH 03302-0511

THE CINCINNATI INSURANCE COMPANY
P.O. BOX 145496
CINCINNATI OH 45250-5496

# NOTICE OF CANCELLATION OF INSURANCE

Named Insured & Mailing Address:

THE RELAX GROUP, LLC
PO BOX 21
NEWPORT NH 03773-0021

Producer: 28028

GALLAGHER BENEFIT SERVICES INC
PO BOX 511
CONCORD NH 03302-0511

Policy No.:  EMP0726342-00
Type of Policy:  MANAGEMENT LIABILITY COVERAGE – CLAIMS MADE
Date of Cancellation:  08/20/2025; 12:01 A.M. Local Time at the mailing address of the Named Insured.

We are cancelling this policy.  Your insurance will cease on the Date of Cancellation shown above.

The reason for cancellation is  Non-Payment of premium.

We have not received your payment of $645.00 that was due on 07/31/2025.

Direct bill charges may apply to your account due to cancellation for non-payment of premium and are not included in the amount shown above. If applicable, the charges will be billed on your next statement. Please see the Disclosure of Direct Bill Fees and Charges included with your account statements for additional information.

If you have already mailed your payment, we thank you. If not, we hope you will keep your insurance coverage in effect by sending payment so it can be processed prior to 08/20/2025 (Date of Cancellation, shown above). Otherwise, your policy will terminate at the date and time stated above. No further notice will be provided.

Your payment may be mailed to:
 • The Cincinnati Insurance Company, P.O. Box 145620,  Cincinnati, OH 45250-5620

Also, you can make your payment online at www.cinfin.com or by calling 800-364-3400.

If you choose to pay your premium online or over the phone, please note that payments confirmed prior to 3 p.m. Eastern Time are applied the same day. Payments made after 3 p.m. and not applied until the next day may not prevent your policy from cancelling. If your policy does cancel for non-payment of premium, reinstatement of coverage is solely at the discretion of the company.

Cancellation may be avoided if premium is paid in full prior to the date of cancellation shown above.

We will refund to you any unearned premium within 30 days from the date of cancellation or completed audit.

Producer

EMP 0190726342/NORTHEAST TERRITORY-2841874***
GALLAGHER BENEFIT SERVICES INC
PO BOX 511
CONCORD NH 03302-0511

Date Mailed:
7th day of August, 2025

Matt Barton

877-942-2455 CORPORATE BILLING

NHCC5NONPMNT
**bates p. 014**08052025MYNY
Page 1 of 1

FORM# CC96970104NH51995
ODEN 3.0.25.04a

Copy for Producer

THE CINCINNATI INSURANCE COMPANY
P.O. BOX 145496
CINCINNATI OH 45250-5496

Named Insured: THE RELAX GROUP, LLC

Policy Number: EMP0726342-00

This page is separate and independent from the notice given.
We are informing you that the following parties were notified of this action.

**PARTIES NOTIFIED**

Named Insured
THE RELAX GROUP, LLC
PO BOX 21
NEWPORT NH 03773-0021

Producer
GALLAGHER BENEFIT SERVICES INC
PO BOX 511
CONCORD NH 03302-0511

# e-CLAS™ Banner Page

## Environment: PRODUCTION

**Policy Number:**    `EMP 072 63 42`

**Effective Date:**    `04-02-2025`

**Named Insured:**    `THE RELAX GROUP, LLC`

```
28-028

GALLAGHER BENEFIT SERVICES
INC
PO BOX 511
CONCORD NH 03302-0511
```

# THE
# CINCINNATI INSURANCE COMPANIES

☒ **THE CINCINNATI INSURANCE COMPANY**   ☐ **THE CINCINNATI INDEMNITY COMPANY**
☐ **THE CINCINNATI CASUALTY COMPANY**

**Named Insured:**   THE RELAX GROUP, LLC

**Policy Number:**   EMP 072 63 42

**Policy Period:**   09-11-2024 to 09-11-2027

**Effective Date of Change:**   04-02-2025

**Endorsement Number:**   1

**Agency Name:**   GALLAGHER BENEFIT SERVICES INC 28-028
CONCORD, NH

### Explanation of Billing

A change was recently made to your policy with The Cincinnati Insurance Companies.  Attached to this summary is the endorsement that amends your policy.

**The additional premium for this endorsement is $**      NONE

This premium   is for the time period of   04-02-2025   to   09-11-2025. You will receive a statement based on the payment option you have selected.

Please contact your agency if you have any questions concerning your policy or statement:
GALLAGHER BENEFIT SERVICES INC
45 CONSTITUTION AVE
CONCORD, NH 03301-5079

603-224-2562

### This is not a bill. No payment is necessary at this time.

**IA 4319 08 07**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## GENERAL CHANGE ENDORSEMENT

Attached to and forming part of:

Policy Number  **EMP 072 63 42**

Effective Date
of Endorsement  **04-02-2025**

Issued to  **THE RELAX GROUP, LLC**

Agent  **GALLAGHER BENEFIT SERVICES INC 28-028**
         **CONCORD, NH**

Endorsement #  **1**

### PREMIUM INFORMATION

Additional Premium     Due at Endorsement Effective Date       **REFER TO IA4319**
Subsequent MONTHLY              Installments INCREASED  by  **$** _____

Revised                          Installment Payment(s)        **$** _____

**It is agreed that the policy is amended as indicated by**  ☒

☒ **Named Insured**

☐ **Mailing Address**

☐ **Principal Address**

☐ **Policy Period**

☐ **Payment Plan**

☐ **Limits**

☐ **Deductibles**

☐ **Form(s)**

**is (are) changed to read as follows:**

AMENDING NAMED INSURED TO READ: THE RELAX GROUP, LLC
AMEND NAMED INSURED FROM BRUSS BUILDING SERVICES GROUP LLC TO THE
RELAX GROUP, LLC

05-06-2025 14:03

**ML 460 A 01 16**

# e-CLAS™ Banner Page

## Environment: PRODUCTION

**Policy Number:**   EMP 072 63 42

**Effective Date:**   09-11-2024

**Named Insured:**   BRUSS BUILDING SERVICES GROUP LLC

28-028

ARTHUR J. GALLAGHER RISK
MANAGEMENT SERVICES, LLC
PO BOX 511
CONCORD NH 03302-0511

**Thank you for placing this coverage with The Cincinnati Insurance Companies!**



The Cincinnati Insurance Companies

**Management Liability**

# TOOLS TO HELP YOU MANAGE RISK

When you purchase Cincinnati's exceptional Pillar™ management liability insurance to protect your organization, you receive access to risk management tools at no additional cost to help you with the complex situations covered by your policy.

Depending on the coverage options you purchase, you may also gain access to services provided by risk management specialists who can answer questions related to managing your community association, employment practices issues, cyber liability exposures or workplace violence. Most of these services are also available at no additional cost.

☐ **Nonprofit Risk Management Portal:** Are you a nonprofit organization looking for expert risk management guidance? Cincinnati's policyholders can register with Nonprofit Risk Management Center, a leader in the risk management space, to help you identify and manage risks that threaten your missions, while empowering you to take bold, mission-advancing steps. Comprehensive risk resources provide practical knowledge on the topics that matter to you, while self assessments lead you – step by step – to building a custom risk management plan. Please visit *cinfin.com/nonprofit-risk-resources* to register for NRMC services; have your Cincinnati Insurance policy number ready.

☐ **Community Association Helpline:** As a Pillar policyholder, you can call a toll-free helpline, 844-458-9556, for assistance reducing or avoiding a potential wrongful acts loss related to managing your community association. Please have your Pillar Directors & Officers policy number ready before you call. When you place your call, leave a message including your name, complete contact information, policy number and your question or concern. A helpline lawyer will call you back, usually within one business day. Please be advised that each helpline call is limited to one hour. There is no additional charge for using this policyholder helpline.

☒ **Employment Practices Helpline:** Do you have questions about how to handle employment situations? Pillar policyholders whose coverage includes Cincinnati's employment practices liability insurance may call our toll-free Employment Connection helpline, 888-811-3427, for guidance from an attorney prior to making employment-related decisions. We offer eligible policyholders an unlimited number of calls seeking advice on employment policies and procedures.

For information, coverage availability in your state, quotes or policy service, please contact your local independent agent recommending coverage.



bates p. 020

*Everything Insurance Should Be®*

☐ **Cyber Risk Management Portal:** Cincinnati's cyber policyholders may access eRiskHub, an online portal that provides news, information and tools to help mitigate a breach or hacking event, virus infection or other cyberattack. On eRiskHub, you will find information about privacy laws, compliance and breach response guides including compliance resources, notification letter examples, and credit bureau and government agency notifications. Other data risk management expertise may be engaged to help diagnose and repair virus infections and other common computer problems. Some services offered may extend beyond what the policy covers and include an additional charge. Please visit *https://eriskhub.com/cic* to set up an account using the access code provided with your policy or available from your agent to begin exploring this valuable resource.

☒ **Workplace Violence Hotline:** After a covered workplace violence event, Pillar policyholders who have added Cincinnati's optional workplace violence expense coverage to their EPLI policy can receive help to create a response and begin the recovery process. Simply call the toll-free, 24-hour hotline, 877-841-1082. It's monitored by Black Swan Solutions, a business unit of Empathia, Inc., which is an industry-leading crisis support organization. Coverage also reimburses recovery expenses for security, public relations, counselors and lost salaries, wages and business income. While policyholders are not obligated to use Black Swan Solutions, this resource is available if you need them.

☐ **Kidnap, Ransom and Extortion:** Success attracts respect, recognition and rewards, yet may leave you vulnerable to kidnapping and extortion attempts. This policy option pays for the vital services of Control Risks Group, a kidnap extortion and crisis management consulting firm. Experts help manage all aspects of the situation, work toward the safe return of the victim and negotiate ransom requests. They also try to identify those responsible, assess the circumstances and search for a motive.

## Selecting the right company

With Cincinnati's Pillar management liability coverage, know that you have an exceptional insurance program from a company offering:

- A management team specifically dedicated to keeping your program on the leading edge
- Superior claims service provided by Cincinnati professionals
- High financial strength rating from A.M. Best Co., reflecting our ability to pay claims and keep our promises.
- For qualifying accounts, multi-year policy terms are available in most states for many coverages, saving you the added time and expense of annual renewals

Your agent recommending Cincinnati can provide more details, answer questions and add the coverage you need.

Thank you for trusting your agent and Cincinnati to protect your business.



*Everything Insurance Should Be®*

Our loss control service is advisory only. We assume no responsibility for management or control of customer loss control activities or for implementation of recommended corrective measures. These materials were gathered from trade services and public information. We have not tried to identify all exposures. We do not warrant that this information is consistent with the underwriting guidelines of The Cincinnati Insurance Company and its subsidiaries or with any federal, state or local law, regulation or ordinance.

This is not a policy. For a complete statement of the coverages and exclusions, please see the policy contract. "The Cincinnati Insurance Companies", "Cincinnati Insurance" and "Cincinnati" refer to member companies of the insurer group providing property and casualty coverages through The Cincinnati Insurance Company or one of its wholly owned subsidiaries – The Cincinnati Indemnity Company or The Cincinnati Casualty Company. Each insurer has sole financial responsibility for its own products. Not all subsidiaries operate in all states. Do not reproduce or post online, in whole or in part, without written permission. Best's ratings are under continuous review and subject to change and/or affirmation. To confirm the current rating, please visit *www.ambest.com*. © 2020 The Cincinnati Insurance Company. 6200 S. Gilmore Road, Fairfield, OH 45014-5141.

 

# NOTICE TO POLICYHOLDERS
# DIRECT BILL ACCOUNT CREDIT PROCEDURE

This is a notice of how an account credit will be applied to your policy or to all of the policies being billed as single account.

**Account Credits**

**A.** If your account is comprised of **a single policy** and an endorsement or premium audit results in a credit (return premium), the credit is applied to that policy. If your account does not have a future installment due at the time the endorsement or audit is processed, the credit is refunded to the payor listed for your account. If you do not wish for credits to be automatically applied to future unpaid installments, please contact us to request a refund. Please note that the amount of the refund may vary based upon the date you contact us and your billing schedule.

**B.** If your account is comprised of **more than one policy** and an endorsement or premium audit results in a credit (return premium), the credit is applied in the following manner:

- Payments previously applied to your account are deferred.

- The credit that results from the endorsement or audit is applied to the policy generating the credit.

- The payments that were deferred are then reapplied to the account in order to satisfy the amount due.

- Any excess payment that results from the credit is applied proportionately to your policies with a future payment or installment due.

- If you do not wish for credits to be automatically applied to future unpaid installments, please contact us to request a refund. Please note that the amount of the refund may vary based upon the date you contact us and your billing schedule.

- If your account does not have a future installment or payment due at the time the endorsement or audit is processed, the credit is refunded to the payor listed for your account.

(Does not apply to audit return premium for payors located in New York; Does not apply to premiums due more than 30 days from the date of processing for payors located in New Hampshire. These credits are automatically refunded to the payor)

To request a refund, contact us at:

| Mailing Address | Toll free phone number | Electronic mail |
|---|---|---|
| The Cincinnati Insurance Company<br>PO Box 14529<br>Cincinnati, OH 45250-0529 | 877-942-2455 | CinciBill@cinfin.com |

**IA 4407 03 13**

# DISCLOSURE OF DIRECT BILL FEES AND CHARGES

NO COVERAGE IS PROVIDED BY THIS DISCLOSURE, nor can it be construed to replace any provision of your policy. YOU SHOULD READ YOUR POLICY AND REVIEW YOUR DECLARATIONS PAGE CAREFULLY for complete information on the coverages provided.

Your insurance premium is being paid directly to us rather than to your insurance agency. We appreciate your prompt payment of the premium. Please note that these fees apply only in the event your payment is late, is returned to us for insufficient funds, or if your policy was previously canceled for nonpayment of premium and has been reinstated at either your or your agents request. We are not required to reinstate a policy once cancellation for nonpayment of premium has become effective. The decision to reinstate coverage is solely at the discretion of the company.

Not all fees are applicable in all states. The types of fees are listed below. Following the description of each fee, we list the states where the fee applies and the amount of the fee. Fees are not levied in KY, MD, MT and NC.

**Non-Sufficient Funds (NSF) Charge:** The first time a premium payment is returned due to Non-Sufficient Funds (NSF), the premium due is the installment amount. For each succeeding return of payment while continuously insured with The Cincinnati Insurance Companies, a charge is added to your next account statement. The amount of the charge is determined by the fees filed with and approved by the state where the payor of your account is located.

$10 AK, FL, NJ, RI, and SC;

$15 MA;

$20 NY; and

$25 AL, AZ, AR, CA, CO, CT, DE, DC, GA, HI, ID, IL, IN, IA, KS, LA, ME, MI, MN, MS, MO, NE, NV, NH, NM, ND, OH, OK, OR, PA, SD, TN, TX, UT, VT, VA, WA, WI, WV and WY.

**Reinstatement Charge:** The first time your account is reinstated for nonpayment of premium, the premium due is the installment amount. For each succeeding reinstatement due to nonpayment of premium while continuously insured with The Cincinnati Insurance Companies, a charge is added to your next account statement. The amount of the charge is determined by the fees filed with and approved by the state where the payor of your account is located.

$10 AK, RI, and SC;

$15 MA;

$20 NY; and

$25 AL, AZ, AR, CA, CO, CT, DE, DC, GA, HI, ID, IL, IN, IA, KS, LA, ME, MI, MN, MS, MO, NE, NV, NH, NM, ND, OH, OK, OR, PA, SD, TN, TX, UT, VT, VA, WA and WY.

**Late Charge:** A charge is added to your next account statement each time your payment is received and processed after the due date as shown on the account statement. This fee will not apply to Electronic Funds Transfer (EFT). The amount of the charge is determined by the fees filed with and approved by the state where the payor of your account is located.

$10 AK, FL, RI, and SC;

$15 MA; and

$25 AL, AZ, AR, CA, CO, CT, DE, DC, GA, HI, ID, IL, IN, IA, KS, LA, ME, MI, MN, MS, MO, NE, NV, NH, NM, ND, OH, OK, OR, PA, SD, TN, TX, UT, VT, VA, WA, WI and WY.

IA 4421 03 13



# The Cincinnati Insurance Company

A Stock Insurance Company

**Headquarters**: 6200 S. Gilmore Road, Fairfield, OH 45014-5141
**Mailing address**: P.O. Box 145496, Cincinnati, OH 45250-5496
*www.cinfin.com* ■ 513-870-2000

# PILLAR
# COMMON POLICY DECLARATIONS

Billing Method: **DIRECT BILL**

Policy Number: **EMP 072 63 42**

Named Insured: **BRUSS BUILDING SERVICES GROUP LLC**

Mailing Address: **PO BOX 21**
**NEWPORT, NH 03773-0021**

Principal Address: **60 ROUTE 103**
**SUNAPEE, NH 03782-3512**

Previous Policy Number: **NEW**

Policy Period: (At 12:01 AM standard time at your principal address shown above.)

FROM: **09-11-2024**       TO: **09-11-2027**

Agency: **ARTHUR J. GALLAGHER RISK MANAGEMENT SERVICES, LLC 28-028**
City, State: **CONCORD, NH**

Shared Annual Aggregate Limit of Liability: **N/A**

Applicable to all **claims** under the following liability coverage parts:

In return for the payment of the premium and subject to all the terms and conditions of this policy, we agree with you to provide the insurance as stated in this policy.

Forms applicable to all coverage parts:

| | | |
|---|---|---|
| **ML400** | **01/16** | **SUMMARY OF PREMIUMS CHARGED** |
| **ML101** | **01/20** | **GENERAL PROVISIONS** |
| **IA4234** | **01/15** | **POLICYHOLDER NOTICE TERRORISM INSURANCE COVERAGE** |
| **ML4032NH** | **12/21** | **NEW HAMPSHIRE CHANGES - CANCELLATION AND NONRENEWAL** |
| **ML4033NH** | **06/18** | **NEW HAMPSHIRE CHANGES - PILLAR POLICY PROGRAM** |

```
ML458      01/16 CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM
IA4427     02/13 NOTICE OF LOSS CONTROL SERVICES
IA4521     03/20 NOTICE OF PRIVACY PRACTICES
IP446      08/01 NOTICE TO POLICYHOLDERS
IA4338     05/11 SIGNATURE ENDORSEMENT
IP412NH    07/12 IMPORTANT INFORMATION TO POLICYHOLDERS - NEW HAMPSHIRE
ML384      04/23 AMENDED WAR EXCLUSION
```

Coverage part declarations:
```
ML508 01/16    PRIVATELY HELD COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE
               PART DECLARATIONS

ML512 01/16    EMPLOYMENT PRACTICES LIABILITY COVERAGE PART DECLARATIONS

ML513 01/18    FIDUCIARY LIABILITY COVERAGE PART DECLARATIONS
```

---

| Policy Number: | **EMP 072 63 42** | Effective Date: **09-11-2024** |
|---|---|---|

# SUMMARY OF PREMIUMS CHARGED

### THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM CHARGE IS INDICATED

**PRIVATELY HELD COMPANY DIRECTORS & OFFICERS LIABILITY**   $ **2,685**

**EMPLOYMENT PRACTICES LIABILITY**   $ **4,423**

**FIDUCIARY LIABILITY**   $ **572**

Installment Charge   $

Total **$ 7,680**

| Payment Plan | First Installment | Remaining Installments |
|---|---|---|
| **MONTHLY** | $ **\*** | $ **\*** |

**SEE BILLING STATEMENT MAILED SEPARATELY**

**ALL OTHER TERMS AND CONDITIONS REMAINS UNCHANGED**

**ML 400 01 16**

# GENERAL PROVISIONS APPLICABLE TO
# ALL LIABILITY COVERAGE PARTS

These General Provisions apply only to those Coverage Parts which include a liability coverage, which shall include all Coverage Parts other than Crime Coverage. Furthermore, any reference to the "policy" in these General Provisions refers to all Coverage Parts other than Crime Coverage.

Throughout this policy, the words "we", "us" and "our" refer to the Company providing this insurance.

In consideration of the payment of the premium, in reliance on all statements in the **application** and all other information provided to us and subject to all the provisions of this policy, including the Declarations, we and the **insureds** agree as set forth below.

### SECTION I - DEFINITIONS

Where set forth in bold type in this policy, whether in singular or in plural, the following terms shall have the meanings indicated.

**A.** **Application** means:

    **1.** The Application Form for this policy;

    **2.** Any materials submitted with the Application Form which shall be maintained on file with us and shall be deemed to be attached hereto as if physically attached; and

    **3.** Any warranty or representation provided to us within the last three years in connection with any policy of which this policy is a renewal or replacement.

**B.** **Claim** means:

    **1.** With respect to the Cincinnati Data Defender™ Coverage Part, the Cincinnati Network Defender™ Coverage Part or the Cincinnati Cyber Defense™ Coverage Part, that meaning which is set forth in the applicable Coverage Part; or

    **2.** With respect to any Coverage Part other than Cincinnati Data Defender™ Coverage Part, the Cincinnati Network Defender™ Coverage Part or the Cincinnati Cyber Defense™ Coverage Part, that meaning which is set forth in the applicable Coverage Part which shall precede the following:

    In the event that a **claim,** as defined herein, was first made during the policy period of any other policy issued by another insurer of which the applicable coverage part of this policy is a direct replacement but no **executive** was aware of such **claim** prior to the expiration of the time to give notice of such claim under such prior policy, such **claim** is deemed to be made on the first service date of **claim** upon any **insured** but only if such claim was submitted to the prior carrier and denied due solely to such **claim** not meeting the prior policy's definition of claim until after the expiration of that policy. However, if such **claim** or any **interrelated claim** was the subject of any notice under any prior policy issued by another carrier of which the applicable coverage part of this policy is a direct replacement and such **claim** was not denied by such prior insurer due to the failure to meet the prior policy's definition of claim until after the expiration of that policy, then such **claim** shall not be deemed to be first made during the **policy period**.

**C.** **Cyber terrorism** means the premeditated use of disruptive activities, or threat to use disruptive activities, against a computer system or network with the intention to cause harm, further social, ideological, religious, political or similar objectives, or to intimidate any person(s) in furtherance of such objectives. Provided, however, that such activities shall not be considered **cyber terrorism** when they are committed by or at the express direction of a government simultaneously engaged in an active conflict involving physical combat by one or more military forces of, or operating at the direction of, nation states or factions in the case of a civil war.

**D.** **Debtor in possession** means a "debtor in possession" as that term is defined in Title 11 of the United States Code, as amended.

**E.** **Defense costs** has the meaning set forth in the applicable coverage part.

**ML 101 01 20**                                                                                             **Page 1 of 10**

**F.**   **Domestic partner** means a natural person who is not otherwise an insured, in a committed relationship with an **insured person**, which is legally recognizable as a marriage, civil union or domestic partnership in the state where the **claim** is made or suit is filed and the legal existence of the relationship is verifiable by legal, government documentation existing prior to the date of the **wrongful act** complained of in the **claim**.

**G.**   **Executive** has the meaning set forth in the applicable coverage part.

**H.**   **Extended reporting period** means the periods of time described in Section **XIX** of the General Provisions.

**I.**   **Insured persons** has the meaning set forth in the applicable coverage part.

**J.**   **Insured** has the meaning set forth in the applicable coverage part.

**K.**   **Interrelated** means all events or incidents which have as a common nexus any:

   **1.**   Fact, circumstance, situation, event, transaction, or cause; or

   **2.**   Series of causally connected facts, circumstances, situations, events, transactions or causes.

**L.**   **Loss** has the meaning set forth in the applicable coverage part.

**M.**   **Named insured** means the entity or entities shown in the applicable Declarations as a Named Insured and any such entity in its capacity as a **debtor in possession**.

**N.**   **Organization** has the meaning set forth in the applicable coverage part.

**O.**   **Personal injury** has the meaning set forth in the applicable coverage part.

**P.**   **Policy period** means the period from the inception date to the expiration date as set forth in the Declarations, or to the earlier date of cancellation of the applicable Coverage Part.

**Q.**   **Policy year** means the period within the **policy period** from the inception date as set forth in the Declarations to the succeeding anniversary date exactly 1 year later at 12:01 AM standard time, and **policy year** means any subsequent annual period between anniversary dates at 12:01 AM standard time thereafter. In the event of a **policy period** less than 1 year, the **policy year** will be the same as the **policy period**.

In the event of an odd term **policy period** longer than 1 year, the **policy year** is the period from the inception date to the next chronological date which precedes the expiration date by exactly 1 or more years at 12:01 AM standard time. If there are subsequent annual periods remaining in the **policy period** after that date at 12:01 AM standard time, such annual periods will each be a **policy year**.

However, if after the issuance of this Coverage Part, any **policy year** is extended for an additional period of less than 12 months, that additional period of time will be deemed to be part of the last preceding **policy year**.

**R.**   **Pollutants** mean any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals, asbestos products, petroleum products and their by-products and waste. Waste includes material to be recycled, reconditioned or reclaimed. **Pollutants** does not mean noise. **Pollutants** include but are not limited to substances that are generally recognized in industry or government to be harmful or toxic to persons, property or the environment. regardless of whether the injury or damage is caused directly or indirectly by the **pollutants** and whether:

   **1.**   The insured is regularly or otherwise engaged in activities which taint or degrade the environment; or

   **2.**   The insured uses, generates or produces the **pollutant**.

**S.**   **Subsidiary** means any entity in which the **named insured** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to vote for election of directors, trustees, managers (if a limited liability company) or equivalent positions and any such entity in its capacity as a **debtor in possession**.

**T.**   **Wrongful Act** has the meaning set forth in the applicable coverage part.

**SECTION II – EXCLUSIONS**

**A.** Nuclear

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, in consequence of, or in any way involving the hazardous properties, including radioactive, toxic or explosive properties, of any nuclear material. Nuclear material means any source material, special nuclear material, or by-product materials as those terms are defined under the Atomic Energy Act of 1954 or any amendments thereto.

**B.** Pollution

We are not liable to pay, indemnify or defend any **claim** for:

**1.** The actual, alleged, or threatened exposure to discharge, generation, storage, transportation, dispersal, seepage, migration, emission, release, treatment, removal, disposal or escape of **pollutants**; or

**2.** Any request, demand, order or statutory or regulatory requirement that the **named insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, **pollutants**; or

**3.** Any demand by or on behalf of any governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, **pollutants**.

However, as it applies to any Directors and Officers Liability Coverage (including Educators Legal Liability), this exclusion shall not apply to any **claim** to which Insuring Agreement **A.** solely applies.

**C.** Prior Knowledge

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, or in consequence of, or in any way involving any **wrongful act** committed, attempted or allegedly committed or attempted prior to the **policy period** of the applicable Coverage Part if:

**1.** Prior to the earlier of the following dates:

**a.** The inception of the applicable Coverage Part;

**b.** The inception of the original Coverage Part of which the applicable Coverage Part is a renewal or replacement; or

**c.** The Continuity Date, if any, stated in the Declarations for the applicable Coverage Part;

any **executive** knew that such **wrongful act** is or would reasonably be regarded as the basis of a **claim**; or

**2.** There is a previous policy under which the **insureds** are entitled to coverage for such **claim**.

**D.** Prior Notice

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, in consequence of, or in any way involving:

**1.** Any **wrongful act** or any fact, circumstance or situation which has been the subject of any accepted notice given prior to the **policy period** under any policy or coverage part of which this policy is a direct or indirect renewal or replacement; or

**2.** Any other **wrongful act** whenever occurring, which, together with a **wrongful act** which has been the subject of such accepted notice, would constitute **interrelated wrongful acts**.

**E.** Prior or Pending Proceeding

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, or in consequence of, or in any way involving any prior or pending demand or civil, criminal, administrative or regulatory proceeding against any **Insured** as of the Prior or Pending Date stated in the Declarations of the applicable coverage part or any fact, circumstance, situation, transaction or event underlying or alleged in such litigation, regardless of the legal theory asserted in such **claim**.

**ML 101 01 20**                                                      **Page 3 of 10**

**F.** Telephone Consumer Protection Act

We are not liable to pay, indemnify or defend any **claim** for any actual or alleged violation of:

**1.** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**2.** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**3.** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**G.** War and Military Action

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, in consequence of, or in any way involving:

**1.** War, including undeclared or civil war; or

**2.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**3.** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these;

regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage.

With respect to any action that comes within the terms of this exclusion and involves nuclear reaction or radiation, or radioactive contamination, this War and Military Action Exclusion supersedes Exclusion **A.** above.

With respect to the Cincinnati Data Defender™ Coverage Form, the Cincinnati Network Defender™ Coverage Form or the Cincinnati Cyber Defense™ Coverage Form only this exclusion will not apply to **cyber terrorism**.

---

## SECTION III - SEVERABILITY OF EXCLUSIONS

With respect to determining the applicability of the above Exclusions, no **wrongful act** or knowledge possessed by any one of the **insureds** shall be imputed to any other **insureds** to determine if coverage is available, unless indicated otherwise.

---

## SECTION IV - LIMITS OF INSURANCE, DEDUCTIBLES, MULTIPLE CLAIMS AND EXHAUSTION

**A.** If a single **claim** is covered under more than one Coverage Part, then our maximum liability for all **loss** resulting from such **claim** shall be the largest applicable Limit of Insurance available under any one of the applicable Coverage Parts.

**B.** The Deductibles for each Coverage Part apply separately to the respective Coverage Parts. If a single **claim** is covered under more than one Coverage Part, the applicable Deductibles shall be applied separately to the part of the **claim** covered by each Coverage Part but the sum of such Deductibles shall not exceed the largest applicable Deductible. The Deductibles shall be borne by the **insureds** uninsured and at their own risk.

**C.** If the aggregate Limit of Insurance for a particular Coverage Part is exhausted, then all of our obligations under that Coverage Part shall be deemed to be completely fulfilled and extinguished as of the date of such exhaustion. If the Shared Annual Aggregate Limit of Liability, if so set forth on the Common Policy Declarations, is exhausted, then all of our obligations under the policy for the remainder of the annual period as described in **SECTION IV.D.** below shall be deemed to be completely fulfilled and extinguished as of the date of such exhaustion.

**D.** The Limits of Insurance of each Coverage Part and the Shared Annual Aggregate Limit of Liability, if so set forth on the Common Policy Declarations, apply separately to each **policy year**. If the **policy period** of the respective Coverage Part is extended after issuance for an additional period of less than 12 months, the additional period will be deemed part of the last preceding period of the respective Coverage part for purposes of determining the Limits of Insurance.

**E.** Regardless of the number of policies or Coverage Parts involved, all **claims** based upon or arising out of the same **wrongful act** or any **interrelated wrongful acts** shall be considered a single **claim**. Each **claim** shall be deemed to be first made at the earliest of the following times:

    **1.** When notice of the earliest **claim** arising out of such **wrongful act** or **interrelated wrongful acts** is received in writing by an **insured** or by us, whichever comes first; or

    **2.** When notice of a **wrongful act** giving rise to such **claim** is given pursuant to Section **VI** of the General Provisions.

**F.** In the event that more than one of the **insureds** is included in the same **claim**, the total amount of **loss** resulting from such **claim** and the Deductible shall be apportioned pro-rata among the **insureds** in proportion to their respective **loss** unless otherwise mutually agreed upon by the **insureds** and us.

## SECTION V - DUTIES OF THE INSUREDS IN THE EVENT OF A CLAIM

As conditions precedent to coverage under this policy:

**A.** The **insureds** shall give us written notice of any **claim** made against any of the **insureds** for a **wrongful act** as soon as practicable after any **executive** of the **named insured** has knowledge of such **claim**, and shall cooperate and provide information as we may reasonably require, including but not limited to providing a description of the **claim**, the nature of the alleged **wrongful act**, the nature of the alleged injury, the names of the claimants, and the manner in which the **insureds** first became aware of the **claim**. As soon as practicable, the **insureds** shall furnish us with copies of reports, investigations, pleadings and other papers in connection with the **claim**.

**B.** The **insureds** shall provide us with all information, assistance and cooperation which we reasonably request and agree that in the event of a **claim** the **insureds** will do nothing which may prejudice our position or our potential or actual rights of recovery. The failure of any **insured person** to do so shall not impair the rights of any other **insured person** under this policy.

**C.** The **insureds** shall not settle any **claim**, incur any **defense costs** or otherwise assume any obligation or admit any liability with respect to any **claim** without our prior written consent. We shall be entitled to full information and all particulars we may request in order to reach a decision as to such consent. We shall not be liable for any settlement, **defense costs**, assumed obligation or admission to which we have not consented.

If the **insureds** fail to provide notice of any **claim** to us as required under this Section, we shall not be entitled to deny coverage for the **claim** based solely upon late notice unless we can demonstrate that our interests were materially prejudiced by reason of such late notice.

This Section does not apply to the Cincinnati Data Defender™ Coverage Form, the Cincinnati Network Defender™ Coverage Form or the Cincinnati Cyber Defense™ Coverage Form.

## SECTION VI - NOTICE OF A WRONGFUL ACT

If prior to the end of the **policy period** of the applicable Coverage Part, any of the **insureds** first become aware of a specific **wrongful act** they believe is likely to give rise to a **claim**, and if any of the **insureds** give us written notice as soon as practicable, but prior to the end of the **policy period** of the applicable Coverage Part, of:

**A.** The specific **wrongful act**;

**B.** The injury or damage which has or may result therefrom; and

**C.** The circumstances by which the **insureds** first became aware thereof;

then any **claim** subsequently made arising out of such **wrongful act** shall be deemed to have been made when notice of the **wrongful act** was first given.

## SECTION VII - DIRECTION OF CORRESPONDENCE TO US

All notices and other materials provided to us pursuant to the terms of this policy shall be directed to the Management Liability Claims Manager at one of the following addresses:

**A.**   MgmtLiabilityClaims@cinfin.com

**B.**   The Cincinnati Insurance Company
P.O. Box 145496
Cincinnati, OH 45250-5496

## SECTION VIII - APPLICATION

The **application** is the basis of this policy and is incorporated into and constitutes a part of this policy. It is agreed by the **insureds** that the statements in the **application** are their representations, that they are material and that this policy is issued in reliance upon the truth of such representations provided.

In the event that the **application** contains any misrepresentation or omission with respect to a specific **wrongful act** or the knowledge of any of the **insureds** of any matter which such **insured** has reason to believe may give rise to a future **claim** made with the intent to deceive or which materially affects the acceptability of the risk or hazard assumed by us, then no coverage shall be afforded for any **claim** based upon, arising from or in consequence of any such misrepresentation or omission. Such misrepresentation or omission shall not be imputed to any other **insureds** for purposes of determining the validity of this policy to such other **insureds** except:

**A.**   Any **insured person** who knew that the statement or representation was not true as of the inception date of coverage;

**B.**   The **organization** with respect to any **executive** who knew that the statement or representation was not true as of the inception date of coverage; and

**C.**   The **organization** if the signer of the **application** knew that the statement or representation was untrue.

We shall not be entitled under any circumstances to void or rescind this policy with respect to any **insured**.

## SECTION IX - CHANGES IN EXPOSURE

**A.   Change in Ownership of Named Insured**

If during the **policy period** of the applicable Coverage Part:

**1.**   The **named insured** consolidates with or merges into another entity such that such **named insured** is not the surviving entity;

**2.**   Another entity or person or group of entities and/or persons acting in concert acquires more than 50% ownership of the **named insured** or voting rights which result in ownership or voting control by the other organization(s) or person(s) of more than 50% of the outstanding securities or voting rights representing the present right to vote for the election of directors, trustees or managers (if a limited liability company) of the **named insured**;

then, subject to all the other provisions of this policy, coverage under the applicable Coverage Part shall continue to apply to such **named insured** and its **insureds** until the end of the applicable **policy period** or any applicable **extended reporting period**, but only with respect to **claims** for **wrongful acts** committed, attempted or allegedly committed or attempted prior to such transaction. The **named insured** shall give written notice to us as soon as practicable, but in no event later than 90 days after such transaction.

**B.   Cessation of Subsidiaries**

If during the **policy period** of the applicable Coverage Part any entity ceases to be a **subsidiary** as defined in the applicable Coverage Part, then, subject to all the other provisions of this policy, coverage under the applicable Coverage Part shall continue to apply to such entity and its **insureds** until the end of the applicable **policy period** or any applicable **extended reporting period**, but only with respect to **claims** for **wrongful acts** committed, attempted or allegedly committed or attempted prior to the date such entity ceases to be a **subsidiary**. The **named insured** shall give written notice to us as soon as practicable, but in no event later than 90 days after the entity ceases to be a **subsidiary**.

**C. Acquisition or Formation of Entity**

If during the **policy period** of the applicable Coverage Part the **named insured** newly acquires or forms another entity over which such **named insured** maintains more than 50% ownership for the purpose of coverage under the Coverage Part applicable to such **named insured**, the newly acquired or formed entity shall be deemed to be a **subsidiary**; however, coverage shall be excess of any indemnification or insurance otherwise available to such newly acquired or formed entity from any other source. Furthermore, coverage does not apply to **claims** for **wrongful acts** committed, attempted or allegedly committed or attempted prior to the date the **named insured** acquired or formed the entity unless we agree, after presentation of a complete application and all appropriate information, to provide coverage by endorsement for such **claims** and the **named insured** pays any additional premium we require for the endorsement.

## SECTION X - OTHER INSURANCE ISSUED BY ANOTHER INSURER

This insurance is primary except when all or any part of **loss** is also insured under any other valid and collectible prior or current policy. If any other insurance issued by another insurer (with the exception of insurance issued by us, any of our affiliated companies, or any of our predecessors or their affiliated companies) applies to any **claim**, then this insurance is excess over that other insurance, whether primary, excess, contingent or on any other basis, unless that other insurance was purchased specifically to apply excess over the limits provided in this policy. Furthermore, with respect to any coverage that may be provided for any **claim** for actual or alleged **personal injury**, such **claims** shall be specifically excess of any similar coverage provided by the **organization's** General Liability Policy.

When this policy is excess:

**A.** We will have no duty to defend any **claim** when any other insurer has that duty. If another insurer fails to defend and we incur costs as a result of such failure, we will be entitled to the **insureds'** rights against such other insurer; and

**B.** We will pay only our share of the amount of the **loss**, if any, that exceeds the sum of:

1. The total amount that all such other insurance would pay for the **loss** in the absence of this policy; and

2. The total of all deductible and self-insured amounts under all such other insurance.

## SECTION XI - SPOUSE AND LEGAL REPRESENTATIVE EXTENSION

The liability coverage parts in this policy will, subject to all other terms, conditions and exclusions of the applicable Coverage Part and the General Provisions, be extended to apply to **claims** for the **wrongful acts** of an **insured person** made against:

**A.** The spouse or **domestic partner** of an **insured person** but only to the extent such person is a party to any **claim** solely in such person's capacity as a spouse or **domestic partner** of an **insured person** and only if the **claim** seeks damages recoverable from marital community property jointly held by the **insured person** and the spouse or **domestic partner**, or property transferred from the **insured person** to the spouse; or

**B.** Their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy.

We have no obligation to make any payment for **loss** in connection with any **claim** against a spouse, **domestic partner**, estates, heirs, legal representatives or assigns of an **insured person** for any actual or alleged, error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted or allegedly committed or attempted by such spouse, **domestic partner**, estates, heirs, legal representatives or assigns.

## SECTION XII - MEDIATION AND ALLOCATION

**A.** Any dispute including but not limited to tort claims or contract claims between an **insured** and us arising out of or relating to this policy shall be submitted to non-binding mediation prior to commencement of an action between the parties. The mediator shall be chosen by agreement. If the parties cannot agree upon a mediator, the mediator shall be chosen by the American Arbitration Association.

**B.** If both **loss** covered by this policy and loss not covered by this policy are incurred in a **claim** for which coverage is afforded, either because a **claim**:

1. Against an **insured** includes both covered and uncovered matters, we will pay 100% of **defense costs** and all remaining loss will be allocated between covered **loss** and uncovered loss based upon the relative legal exposure to the parties to such matters; or

2. Is made against both an **insured** and others, we will pay **defense costs** for our **insured**, and all remaining loss will be allocated between covered **loss** and uncovered loss based upon the relative legal exposure to the parties to such matters.

C. If we and the **insureds** cannot agree as to matters in **B.** above prior to a judgment or finding in the civil or administrative proceeding dealing with **claims** against the **insureds**, the parties agree that they will, to the extent it is within their control, require that the allocation between covered **loss** and uncovered loss is made in such civil or administrative proceeding. Such efforts shall include but are not limited to the submission of special interrogatories to the finder of fact in such proceeding. Such efforts shall not require us to become a party to such civil or administrative proceeding.

D. Notwithstanding **C.** above, if we and the **insureds** cannot agree as to matters in Section **B.** above prior to a judgment or finding in any civil or administrative proceeding in which such issues are decided, we may at any time before or after mediation under **A.** above settle all **claims** against any or all **insureds**. Following such settlement, any dispute between us and the **insureds** as to the proper allocation of covered and uncovered matters under **B.** above shall be submitted to non-binding mediation prior to the commencement of an action between the parties. In any event, only one mediation as to the same issues shall be required.

## SECTION XIII - ACTION AGAINST US

A. No action shall be taken against us unless, as a condition precedent thereto, there has been full compliance with all of the terms of this policy and until the obligation of the **insureds** to pay shall have been finally determined, either by an adjudication against them or by written agreement of the **insureds**, the claimant and us. Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. Bankruptcy or insolvency of an **insured** or of an **insured's** estate shall not relieve us of any of our obligations hereunder.

B. No person or organization shall have any right under this policy to join us as a party to any **claim**. Neither the **insureds** nor their legal representative shall implead us in any **claim**.

This Section does not apply to the Cincinnati Data Defender™ Coverage Form, the Cincinnati Network Defender™ Coverage Form or the Cincinnati Cyber Defense™ Coverage Form.

## SECTION XIV - SUBROGATION

In the event of any payment under this policy, we shall be subrogated to all of the rights to recovery of the **insureds** to the extent of such payment. The **insureds** shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents as may be necessary to enable us to effectively bring suit in the name of the **insureds**.

## SECTION XV - CHANGES IN THIS POLICY

No change or modification of, or assignment of interest under this policy shall be effective except when made by us through a written endorsement to this policy.

## SECTION XVI - CONFORMITY TO STATUTE

Any terms of this policy which are in conflict with the terms of any applicable laws construing this policy are hereby amended to conform to such laws.

## SECTION XVII - ENTIRE AGREEMENT

By acceptance of this policy, we and the **insureds** agree that this policy (including the **application**) and any written endorsements attached hereto constitute the entire agreement between the parties.

**SECTION XVIII - REPRESENTATION BY NAMED INSURED**

The first **named insured** shall act on behalf of all of the **insureds** in purchasing this policy and for any purposes under the policy.

**SECTION XIX - EXTENDED REPORTING PERIODS**

**A.**  Upon termination of any Coverage Parts for any reason, other than nonpayment of premium, the **named insured** shall be provided a 90 day Automatic Extended Reporting Period and have the option to replace the 90 day Automatic Extended Reporting Period with a 12 month Optional Extended Reporting Period. The **named insured** may also request an Optional Extended Reporting Period with a term longer than 12 months, which may be provided solely at our discretion.

    **1.**  Automatic Extended Reporting Period

    A 90 day Automatic Extended Reporting Period is automatically provided without additional charge. The Automatic Extended Reporting Period starts immediately after the end of the **policy period** of the applicable Coverage Part.

    **2.**  Optional Extended Reporting Periods

        **a.**  The **named insured** shall have the option to purchase a 12 month Extended Reporting Period to replace the 90 day Automatic Extended Reporting Period for an additional premium equal to 75% of the expiring annual premium for the applicable Coverage Part.

        **b.**  Additional Optional Extended Reporting Periods may be available for an additional premium charge if an Extended Reporting Period longer than 12 months is desired. It is solely our decision whether to permit the first **named insured** to purchase an Extended Reporting Period with a term longer than 12 months.

    The first **named insured** must give us a written request of their intent to purchase an Optional Extended Reporting Period within 60 days after the **policy period** of the applicable Coverage Part or that option shall terminate. The Optional Extended Reporting Period will not go into effect unless the first **named insured** pays the additional premium promptly when due.

**B.**  The Extended Reporting Periods do not extend the **policy period** or change the scope of coverage provided. They extend the **claims** reporting period.

**C.**  The Extended Reporting Periods extend coverage to **claims** first made during the length of time covered by the applicable Extended Reporting Period provided the **wrongful act** was committed, attempted or allegedly committed or attempted prior to the end of the **policy period** of the applicable Coverage Part, and all such **claims** shall be subject to all other terms, conditions and exclusions of the applicable Coverage Part and the General Provisions. Such **claims** must be reported in writing to us prior to the expiration of the applicable Extended Reporting Period.

**D.**  The Extended Reporting Period, regardless of length does not reinstate or increase the Limits of Insurance of the applicable Coverage Part or the Shared Annual Aggregate Limit of Liability, if so set forth on the Common Policy Declarations. Our total liability shall not exceed the Limit of Insurance shown in the applicable Declarations for the last **policy year** in which coverage is provided hereunder.

**E.**  Any Extended Reporting Period will immediately terminate on the effective date and time of any other insurance issued to the **insureds** which replaces this insurance. The entire premium for any Extended Reporting Period shall be fully earned at the commencement of any Extended Reporting Period.

**F.**  If the terms under this section are invoked under the Cincinnati Data Defender™ Coverage Part or the Cincinnati Cyber Defense™ Coverage Part, the term **claim** as used in this section may also mean **regulatory proceeding.**

**SECTION XX - COVERAGE TERRITORY**

This policy applies to any **claim** for a **wrongful act** committed, attempted or allegedly committed or attempted anywhere in the world unless indicated otherwise. However, if insurance provided by this policy would be in violation of any United States economic or trade sanctions, such insurance shall be null and void.

**ML 101 01 20**

## SECTION XXI - LIBERALIZATION

If we adopt any revision that would broaden the coverage under this insurance and would be effective during the **policy period** without additional premium, the broadened coverage will immediately apply to this insurance as of the latter of:

**A.** The date we implemented the change in the headquarters state which is the basis upon which the policy was issued; or

**B.** The date the applicable Coverage Part became effective.

## SECTION XXII - PARENT COMPANY AND FRANCHISOR EXTENSION

Upon written request of the president, chairperson or equivalent position of the **named insured,** we shall extend coverage under this policy to **defense costs** resulting from any **claim** made against a parent company or franchisor of the **named insured** or any **subsidiary** but only if and so long as:

**A.** The **claim** arises out of a **wrongful act** actually or allegedly committed solely by an **insured**;

**B.** The **insured** is included as a co-defendant in addition to the parent company or franchisor; and

**C.** The **insured** as well as the parent company or franchisor are represented by the same counsel in connection with such **claim**.

For the purposes of this extension, a parent company or franchisor shall include:

**A.** Any entity other than a natural person which owns more than 50% of the outstanding securities or voting rights representing the present right to vote for election of directors, trustees, managers (if a limited liability company) or equivalent of a **named insured** or **subsidiary**; or

**B.** Any franchisor who has granted to an **insured** under a franchise agreement any franchise or franchise rights to allow the **insured** to operate as a franchisee or a franchised dealer.

This Section does not apply to the Cincinnati Data Defender™ Coverage Form, the Cincinnati Network Defender™ Coverage Form or the Cincinnati Cyber Defense™ Coverage Form.

## SECTION XXIII – STATE INCONSISTENCY

In the event there is an inconsistency between a state amendatory endorsement attached to this policy and any term or condition of this policy, then where permitted by law, we shall apply those terms and conditions which are most favorable to the **insured**.

# POLICYHOLDER NOTICE
# TERRORISM INSURANCE COVERAGE

Your policy (or the policy proposed to you) contains coverage for certain losses caused by terrorism.

## Premium:

In accordance with the federal Terrorism Risk Insurance Act, we are required to notify you of the portion of the premium, if any, attributable to the coverage for terrorist acts certified under the Terrorism Risk Insurance Act.

- The portion of your premium that is attributable to coverage for terrorist acts certified under the Act is

  $ 0_____.

## Federal Participation:

The Act also requires us to provide disclosure of federal participation in payment of terrorism losses.

- Under your policy, any losses caused by certified acts of terrorism would be partially reimbursed by the United States Government, Department of Treasury, under a formula established by federal law. Under this formula, the federal share equals a percentage, as specified in the Schedule below, of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

- **Schedule:**

| Federal Share of Terrorism Losses | |
|---|---|
| **Percentage** | **Calendar Year** |
| 85% | 2015 |
| 84% | 2016 |
| 83% | 2017 |
| 82% | 2018 |
| 81% | 2019 |
| 80% | 2020 |

## Cap on Insurer Participation:

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**NOTE:** **THIS NOTICE IS PROVIDED TO SATISFY THE REQUIREMENTS UNDER THE TERRORISM RISK INSURANCE ACT FOR POLICYHOLDER DISCLOSURE: (1) AT THE TIME OF OUR OFFER OF COVERAGE AND (2) AT THE TIME COVERAGE IS ISSUED.**

**IA 4234 01 15**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

## NEW HAMPSHIRE CHANGES - CANCELLATION AND NONRENEWAL

---

This endorsement modifies insurance provided under the following:

**PILLAR POLICY PROGRAM**

The following provision is added:

**CANCELLATION AND NONRENEWAL**

**A.** The first **named insured** may cancel this policy or any of its Coverage Parts by mailing or delivering to us advance written notice of cancellation.

**B.** We may cancel this policy or any of its Coverage Parts by mailing or physically delivering to the **named insured** written notice of cancellation, stating the reasons for cancellation, at least:

   **1.** 10 days before the effective date of cancellation if we cancel for:

      **a.** Nonpayment of premium; or

      **b.** Substantial increase in hazard;

   **2.** 60 days before the effective date of cancellation if we cancel for any other reason. Such notice may only be sent for cancellation effective at a policy anniversary at the end of a **policy year**.

**C.** If this policy has been in effect for 60 days or more, or if this is a renewal of a policy we issued, we may cancel only for one or more of the following reasons:

   **1.** Nonpayment of premium;

   **2.** Fraud or material misrepresentation affecting the policy or in the presentation of a claim thereunder, or violation of any of the terms or conditions of the policy; or

   **3.** A change in the risk that substantially increases a hazard insured against after insurance coverage has been issued or renewed.

**D.** We will mail or physically deliver our notice to the **named insured's** last mailing address known to us.

**E.** Notice of cancellation will state the effective date of cancellation. The **policy period** will end on that date.

**F.** If this policy or any of its Coverage Parts is cancelled, we will send the first **named insured** any premium refund within 30 days of the date when the refund becomes due. The refund will be pro rata. The cancellation will be effective even if we have not made or offered a refund.

**G. NONRENEWAL**

   **1.** If we elect not to renew this policy or a particular Coverage Part, we will mail or physically deliver written notice of nonrenewal, stating the reasons for nonrenewal, to the **named insured's** last mailing address known to us at least 60 days prior to the expiration of the policy, or its anniversary date if it is a policy written for a term of more than one year.

   **2.** However, we need not mail or physically deliver this notice if:

      **a.** We have indicated a willingness to renew;

      **b.** We refuse to renew due to a nonpayment of premium;

      **c.** The **named insured** does not pay any advance premium required by us for renewal; or

      **d.** Any property covered in this policy is insured under any other insurance policy.

   **3.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**H.** Any renewal premium increase of 25 percent or less shall not be implemented until the insured has had a minimum of 30 days' notice of the renewal premium. If all or any part of the 30 day notice is not in advance of the expiration or anniversary date, renewal coverage shall be provided, on a pro rata basis, at the rates or premiums in effect under the expiring policy until the 30 days' notice requirement has been fulfilled. This paragraph shall not apply if the insured accepts the renewal policy.

Development of renewal premium for the purpose of determining the percentage of change from expiring premium shall be based on the same coverages, conditions, and ratable exposures as those contained in the expiring policy.

**I.** However, notwithstanding our failure to comply with this section, any coverage shall terminate on the effective date of any other coverage acquired by the insured to the extent the acquired coverage substantially duplicates coverages of the renewal. Renewal of a policy shall not constitute a waiver or estoppel with respect to grounds for cancellation which existed before the effective date of such renewal.

All other provisions of the policy remain unchanged except as herein expressly modified.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

# NEW HAMPSHIRE CHANGES - PILLAR POLICY PROGRAM

---

This endorsement modifies insurance provided under the following:

**BANKERS PROFESSIONAL LIABILITY COVERAGE**
**CINCINNATI CYBER DEFENSE<sup>TM</sup> COVERAGE**
**CINCINNATI DATA DEFENDER<sup>TM</sup> COVERAGE**
**CINCINNATI NETWORK DEFENDER<sup>TM</sup> COVERAGE**
**COMMUNITY ASSOCIATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**EDUCATORS LEGAL LIABILITY COVERAGE**
**EMPLOYMENT PRACTICES LIABILITY COVERAGE**
**FIDUCIARY LIABILITY COVERAGE**
**FINANCIAL INSTITUTIONS DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**GENERAL PROVISIONS APPLICABLE TO ALL LIABILITY COVERAGE PARTS**
**HEALTHCARE INSTITUTIONS DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**PRIVATELY HELD COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**PUBLICLY TRADED COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**TRUST SERVICES ERRORS AND OMISSIONS COVERAGE**

A. **SECTION VII - DIRECTION OF CORRESPONDENCE TO US** of the **GENERAL PROVISIONS APPLICABLE TO ALL LIABILITY COVERAGE PARTS** is deleted in its entirety and replaced by the following:

   **SECTION VII - DIRECTION OF CORRESPONDENCE TO US**

   All notices and other materials provided to us pursuant to the terms of this policy shall be directed to either a Cincinnati Insurance Company licensed agent or to:

   Management Liability Claims Manager
   The Cincinnati Insurance Company
   P.O. Box 145496
   Cincinnati, OH 45250-5496

B. **SECTION XVIII - REPRESENTATION BY NAMED INSURED** of the **GENERAL PROVISIONS APPLICABLE TO ALL LIABILITY COVERAGE PARTS** is deleted in its entirety.

C. Paragraph **A.** of **SECTION XIX - EXTENDED REPORTING PERIODS** of the **GENERAL PROVISIONS APPLICABLE TO ALL LIABILITY COVERAGE PARTS** is deleted in its entirety and replaced by the following:

   A. Upon termination of any Coverage Parts for any reason, the **named insured** shall be provided a 90 day Automatic Extended Reporting Period and shall have the option to purchase a 12 month Optional Extended Reporting Period. The **named insured** may also request an Optional Extended Reporting Period with a term longer than 12 months, which may be provided solely at our discretion.

   1. Automatic Extended Reporting Period

      A 90 day Automatic Extended Reporting Period is automatically provided without additional charge. The Automatic Extended Reporting Period starts immediately after the end of the **policy period** of the applicable Coverage Part.

   2. Optional Extended Reporting Periods

      a. The **named insured** shall have the option to purchase a 12 month Extended Reporting Period for an additional premium equal to 75% of the expiring annual premium for the applicable Coverage Part.

---

**ML 4033 NH 06 18**

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**Page 1 of 2**
**bates p. 040**

   **b.** Additional Optional Extended Reporting Periods may be available for an additional premium charge if an Extended Reporting Period longer than 12 months is desired. It is solely our decision whether to permit the first **named insured** to purchase an Extended Reporting Period with a term longer than 12 months.

The first **named insured** must give us a written request of their intent to purchase an Optional Extended Reporting Period within 60 days after the **policy period** of the applicable Coverage Part or that option shall terminate. The Optional Extended Reporting Period will not go into effect unless the first **named insured** pays the additional premium promptly when due.

The Optional Extended Reporting Period starts when the Automatic Extended Reporting Period, as set forth in **SECTION XIX - A.1.** above, ends.

Once in effect, the Optional Extended Reporting Period may not be cancelled.

**D.** With respect to the **DEFINITIONS** Section of all Coverage Parts, the following paragraph is added to all definitions of the term **claim**:

Provided further that the definition of **claim** is not intended, nor shall it be construed, to provide for, in whole or in part, reimbursement of penalties or indemnification for the violation of any Federal, State or local statute, including reimbursement of penalties or sanctions imposed upon an **insured**.

**E.** With respect to the **DEFINITIONS** Section of all Coverage Parts, the following paragraphs are added to all definitions of the term **loss**:

In no event will punitive, exemplary or multiplied damages be insurable under this contract of insurance with respect to a **claim** brought against a New Hampshire domiciled insured in a New Hampshire state court, except to the extent such damages are insurable under New Hampshire law;

Provided further that the definition of **loss** is not intended, nor shall it be construed, to provide for, in whole or in part, reimbursement of penalties or indemnification for the violation of any Federal, State or local statute, including reimbursement of penalties or sanctions imposed upon an **insured**.

**F.** With respect to the **EXCLUSIONS** Section of all Coverage Parts, the <u>Conduct</u> Exclusion, if any, is amended as follows:

The words "deliberately" and "willful" are deleted in their entirety.

**G.** With respect to the **EXCLUSIONS** Section of all Coverage Parts and of the **GENERAL PROVISIONS APPLICABLE TO ALL LIABILITY COVERAGE PARTS**, the following is added:

No exclusion precludes coverage for intra-family or inter-spousal claims.

**H.** With respect to the **EXCLUSIONS** Section of all Coverage Parts, the <u>Bodily Injury/Property Damage</u> Exclusion and the <u>Bodily/Personal Injury and Property Damage</u> Exclusion, if any, are amended as follows:

The words "assault" and "battery" are deleted in their entirety.

**I.** With respect to **CINCINNATI CYBER DEFENSE COVERAGE, SECTION II - DEFINITIONS, 5. Bodily Injury** is deleted in its entirety and replaced with the following:

   **5.** **Bodily injury** means bodily harm or injury, sickness, disease, humiliation, shock, fright, mental anguish or mental injury, including care, loss of services or death resulting from any of these at any time.

**J.** With respect to **CINCINNATI NETWORK DEFENDER COVERAGE, SECTION II - DEFINITIONS, 2. Bodily Injury** is deleted in its entirety and replaced with the following:

   **2.** **Bodily injury** means bodily harm or injury, sickness, disease, humiliation, shock, fright, mental anguish or mental injury, including care, loss of services or death resulting from any of these at any time.

All other provisions of the policy remain unchanged except as herein expressly modified.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**ML 4033 NH 06 18**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

---

This endorsement modifies insurance provided under the following:

**GENERAL PROVISIONS APPLICABLE TO ALL LIABILITY COVERAGE PARTS**

A.  **SECTION I - DEFINITIONS** is amended to add the following:

**Certified act of terrorism** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a **certified act of terrorism** include the following:

1.  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

B.  **CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

C.  **APPLICATION OF OTHER EXCLUSIONS**

The terms and limitations of any terrorism exclusion, or the inapplicability, omission or absence of a terrorism exclusion does not serve to create coverage for any **loss** which would otherwise be excluded under this policy, such as **losses** excluded by:

1.  Exclusions that address war, warlike action, insurrection, rebellion, revolution, military action, nuclear hazard, nuclear materials, nuclear reaction, radiation, or radioactive contamination;

2.  Exclusions that address pollutants, contamination, deterioration, fungi or bacteria; or

3.  Any other exclusion,

regardless if the **certified act of terrorism** contributes concurrently or in any sequence to the **loss**.

D.  **SUNSET CLAUSE**

If the federal Terrorism Risk Insurance Act expires or is repealed, then this endorsement is null and void for any act of terrorism that takes place after the expiration or repeal of the Act.

All other provisions of the policy remain unchanged except as herein expressly modified.

Includes copyrighted material of Insurance Services Office, Inc., and American Association of Insurance Services, Inc., with their permission.

**ML 458 01 16**

**bates p. 042**

# NOTICE OF LOSS CONTROL SERVICES

The Cincinnati Insurance Companies provide certain loss prevention services to policyholders at no additional cost. These services are designed to prevent or reduce the impact of potential loss causing events or conditions related to the type(s) of insurance coverage you have purchased from us. One of these services that you can receive is described below:

Employment Practices Liability (EPL) Toll-Free Hot Line

Have a question on how to handle an employment situation? Simply call The Cincinnati Insurance Companies Employment Connection at 1-888-811-3427 for assistance. We offer policyholders an unlimited number of calls seeking advice on employment policies and procedures.

The services provided are advisory in nature. While this program is offered as a resource in developing or maintaining a loss prevention program, you should consult competent legal counsel to design and implement your own program. No liability is assumed by reason of the services, access or information provided. All services are subject to change without notice. Use of the EPL Toll-Free Hot Line will not be deemed to satisfy any notice of claim or notice of wrongful act provision contained in any policy.

**IA 4427 02 13**

# NOTICE OF PRIVACY PRACTICES

For additional information on our privacy policies, including state specific information, please visit https://www.cinfin.com/privacy-policy.

**IA 4521 03 20**

# THE CINCINNATI INSURANCE COMPANY
# THE CINCINNATI CASUALTY COMPANY
# THE CINCINNATI INDEMNITY COMPANY

## NOTICE TO POLICYHOLDERS

Please be advised that in your application for insurance you disclosed information to The Cincinnati Insurance Company, The Cincinnati Casualty Company and The Cincinnati Indemnity Company.  The information disclosed in the application and all information subsequently collected by any of these companies may be shared among all three.

IP 446 08 01

bates p. 045

# SIGNATURE ENDORSEMENT

IN WITNESS WHEREOF, this policy has been signed by our President and Secretary in the City of Fairfield, Ohio, but this policy shall not be binding upon us unless countersigned by an authorized representative of ours. The failure to countersign does not void coverage in Arizona, Virginia and Wisconsin.

Secretary                                                                              President

The signature on any form, endorsement, policy, declarations, jacket or application other than the signature of the President or Secretary named above is deleted and replaced by the above signatures.

**IA 4338 05 11**

# IMPORTANT INFORMATION TO POLICYHOLDERS - NEW HAMPSHIRE

In the event you need to contact someone about this policy for any reason, please contact your agent. If you have additional questions, you may contact the insurance company issuing this policy at the following address, telephone numbers or website:

The Cincinnati Insurance Company
The Cincinnati Casualty Company
The Cincinnati Indemnity Company
P.O. Box 145496
Cincinnati, Ohio  45250-5496
Telephone 513-870-2000
Toll-Free 888-242-8811
Toll-Free Claims 877-242-2544
www.cinfin.com

**IP 412NH 07 12**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

## AMENDED WAR EXCLUSION

---

This endorsement modifies insurance provided under the following:

**GENERAL PROVISIONS APPLICABLE TO ALL LIABILITY COVERAGE PARTS**
**CRIME COVERAGE**
**CRIME EXPANDED COVERAGE (XC®)**

**A.** For the purposes of this endorsement only, the **DEFINITIONS** section of any Provisions or Coverage Part of this policy is amended to include the following:

1. **Agents** means any person, entity, organization or collection of persons, entities or organizations that have at any time been associated with or designated as having worked with or acted on behalf of any state, government, or sovereign.

   The attribution of the actors' status as **agents** will be determined by relying on reasonable evidence such as, but not limited to:

   a. Statements by an agency or department of the United States government;

   b. Statements by an international group of which the United States is a member, such as the United Nations or the North Atlantic Treaty Organization, or any member of such an international group; or

   c. Statements by a **recognized commercial authority**.

2. **Computer system** means any computer or network of computers or computer systems, hardware, software, communications system, electronic device (including but not limited to, smart phone, laptop, tablet, wearable device), server, cloud infrastructure or microcontroller including any configuration of the aforementioned and including any associated input, output, code, program, data, data storage device, networking equipment or back up facility.

3. **Cyber hostilities** means the use of a **computer system** that causes disruption or harm.

4. **Recognized commercial authority** means a business that provides information technology security or forensics services, including, but not limited to:

   a. Symantec;

   b. Mandiant;

   c. Microsoft;

   d. Apple;

   e. Cisco; or

   f. IBM.

5. **War** or **warlike action:**

   a. Means physical combat, a state of armed conflict, or **cyber hostilities** engaged in by:

      (1) Any state, government, or sovereign; or

      (2) **Agents** of a state, government, or sovereign,
      against any other:

         (a) State, government, or sovereign, including an agency or department thereof; or

         (b) Person or entity targeted by such physical combat, armed conflict, or **cyber hostilities**; and

   b. Includes any collateral loss, damage, cost, expense or liability for damages of any nature arising out of the physical combat, armed conflict, or **cyber hostilities** or any response to such physical combat, armed conflict, or **cyber hostilities**.

**B.** Any exclusion of <u>War and Military Action</u> is deleted in its entirety from any **EXCLUSIONS** section of any Provisions or Coverage Part of this policy and is replaced with the following:

**G.  <u>War</u>**

This insurance does not apply to any form of loss, damage, cost, expense or liability for damages arising directly or indirectly from:

**1.** **War** and **warlike action**, including undeclared or civil **war** and **cyber hostilities**;

**2.** Hostile action, including action in hindering or defending against an actual or expected attack, by any state, government, or sovereign using military personnel or other **agents**; or

**3.** Insurrection, rebellion, revolution, usurped power, political violence or action taken by a state or government actor in hindering or defending against any of these, including **cyber hostilities** in connection with any of the foregoing.

The attribution of an action will be determined by relying on reasonable evidence such as, but not limited to:

**a.** Statements by an agency or department of the United States government;

**b.** Statements by an international group of which the United States is a member, such as the United Nations or the North Atlantic Treaty Organization, or any member of such an international group; or

**c.** Statements by a **recognized commercial authority**.

This exclusion applies notwithstanding anything to the contrary in this policy or any appendix or endorsement added to this policy.

All other provisions of the policy remain unchanged except as herein expressly modified.

# The Cincinnati Insurance Company

A Stock Insurance Company

# PRIVATELY HELD COMPANY
# DIRECTORS AND OFFICERS LIABILITY
# COVERAGE PART DECLARATIONS

**THIS COVERAGE PART PROVIDES CLAIMS-MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD. TO THE EXTENT IT IS NOT OTHERWISE INDICATED, THE LIMIT OF INSURANCE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY DEFENSE COSTS, AND DEFENSE COSTS WILL BE APPLIED AGAINST THE DEDUCTIBLE. IN NO EVENT WILL WE BE LIABLE FOR DEFENSE COSTS OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE LIMIT OF INSURANCE. READ THE ENTIRE POLICY CAREFULLY.**

Policy Number: **EMP 072 63 42**

Named Insured is the same as it appears in the Common Policy Declarations unless another entry is made here.

Coverage under the following Insuring Agreements has been purchased: **A, B, C**

| | | |
|---|---|---|
| Limit of Insurance: | $ **1,000,000** | in the aggregate |
| Investigative Costs Sublimit: | $ **100,000** | in the aggregate |

| | | |
|---|---|---|
| Additional Defense Limit of Insurance: | $ **NOT COVERED** | in the aggregate |

| | | |
|---|---|---|
| Excess Side A Limit of Insurance: | $ **1,000,000** | in the aggregate |

| | | |
|---|---|---|
| | $ **0** | each **claim** under Insuring Agreement **A** (Insured Persons) |
| Deductibles: | $ **10,000** | each **claim** under Insuring Agreement **B** (Indemnification) |
| | $ **10,000** | each **claim** under Insuring Agreement **C** (Organization) |

| | |
|---|---|
| Retroactive Date: | **N/A** |
| Prior or Pending Date: | **09-11-2024** |
| Continuity Date: | **09-11-2024** |

Forms and endorsements applicable to this coverage part:

| | | |
|---|---|---|
| ML108 | 01/18 | PRIVATELY HELD COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE |
| ML210 | 01/21 | CRISIS MANAGEMENT EMERGENCY RESPONSE EXPENSES ENDORSEMENT |
| ML329 | 01/16 | PROFESSIONAL LIABILITY EXCLUSION (SCHEDULED) |
| ML357 | 01/21 | AMENDED CYBER EXCLUSION |
| ML360 | 01/21 | BIOMETRIC INFORMATION PRIVACY EXCLUSION |
| ML4242 | 01/21 | SPLIT CLAIMS-MADE DATES ENDORSEMENT |
| ML4268 | 01/21 | EARLY MEDIATION DEDUCTIBLE REDUCTION ENDORSEMENT |

**ML 508 01 16**

`09-26-2024 00:49`

EMP 072 63 42
**bates p. 051**

# PRIVATELY HELD COMPANY
# DIRECTORS AND OFFICERS LIABILITY COVERAGE

### TABLE OF CONTENTS

**Coverage Part Provision:**                                                                    **Begins on Page:**

**SECTION I - INSURING AGREEMENTS** ...................................................................................2

**SECTION II - DEFINITIONS**.............................................................................................2

**SECTION III - EXCLUSIONS** ..........................................................................................4

**SECTION IV - SEVERABILITY OF EXCLUSIONS** ...................................................................6

**SECTION V - LIMIT OF INSURANCE AND DEDUCTIBLES**.........................................................6

**SECTION VI - DEFENSE, INVESTIGATION AND SETTLEMENT** ..................................................7

# PRIVATELY HELD COMPANY
# DIRECTORS AND OFFICERS LIABILITY COVERAGE

**THIS COVERAGE PART PROVIDES CLAIMS-MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD. TO THE EXTENT IT IS NOT OTHERWISE INDICATED, THE LIMIT OF INSURANCE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY DEFENSE COSTS, AND DEFENSE COSTS WILL BE APPLIED AGAINST THE DEDUCTIBLE. IN NO EVENT WILL WE BE LIABLE FOR DEFENSE COSTS OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE LIMIT OF INSURANCE. READ THE ENTIRE POLICY CAREFULLY.**

## SECTION I - INSURING AGREEMENTS

**A.** We will pay on behalf of the **insured persons** all **loss** which they shall be legally obligated to pay, except for such **loss** which the **organization** actually pays as indemnification, resulting from any **claim** first made during the **policy period**, or any **extended reporting period** included in or endorsed to the policy, for a **wrongful act**.

**B.** We will pay on behalf of the **organization** all **loss** which the **organization** is required to pay as indemnification to the **insured persons** resulting from any **claim** first made during the **policy period**, or any **extended reporting period** included in or endorsed to the policy, for a **wrongful act**.

**C.** If set forth in the Privately Held Company Directors and Officers Liability Coverage Part Declarations, we will pay on behalf of the **organization** all **loss** which the **organization** is required to pay resulting from any **claim** first made during the **policy period**, or any **extended reporting period** included in or endorsed to the policy, against the **organization** for a **wrongful act**.

We will have the right and duty to select counsel and defend the **insureds** against any such **claim**.

## SECTION II - DEFINITIONS

Where set forth in bold type in this Coverage Part, whether in singular or in plural, the following terms shall have the meanings indicated.

**A.** **Claim** means:

**1.** A written demand for monetary damages or non-monetary relief;

**2.** A civil proceeding commenced by the filing of a complaint or similar pleading;

**3.** A formal administrative or regulatory proceeding commenced by a filing of a complaint, charge, formal investigative order or similar document;

**4.** An arbitration, mediation or similar alternative dispute resolution proceeding in which monetary damages are sought if the **insured**:

    **a.** Is required to participate in such proceeding; or

    **b.** Agrees to participate in such proceeding with our written consent, such consent not to be unreasonably withheld;

**5.** A criminal proceeding commenced by the return of an indictment;

**6.** A written request to toll or waive a statute of limitations relating to a potential **claim** described in Definitions **A.1.** through **A.5.** above; or

**7.** A civil, administrative, regulatory or criminal investigation of an **insured person** once such **insured person** is identified in writing by such investigating authority as a person against whom a proceeding described in Definitions **A.2.**, **A.3** or **A.5.** may be commenced. The maximum Limit of Insurance for all such investigations against any **insured persons** shall be the Investigative Costs Sublimit set forth in the Privately Held Company Directors and Officers Liability Coverage Part Declarations. This sublimit shall be part of and not in addition to the Limit of Insurance set forth in the Privately Held Company Directors and Officers Liability Coverage Part Declarations and does not increase our maximum aggregate liability under this Coverage Part;

against any **insured**, including any appeal therefrom.

ML 108 01 18

**B.** **Defense costs** means reasonable and necessary fees, costs, and expenses incurred by us or with our consent on behalf of the **insureds** or reimbursed to any of the **insureds** by us, resulting solely from the investigation, adjustment, defense and appeal of any **claim**. **Defense costs** includes, but is not limited to, the cost of expert consultants and witnesses, and premiums for appeal, injunction, attachment or supersedeas bonds (but not the obligation to furnish such bonds).

**Defense costs** shall not include:

1. Salaries, wages, fees, overhead or expenses of our employees or any **insureds**, directors, officers, trustees or employees, other than that portion of our employed attorneys' fees, salaries and expenses allocated to a specific **claim**;

2. Any amount covered by the duty to defend obligation of any other insurer; or

3. Any pre-tender fees, costs or expenses.

**C.** **Directors and officers** means any natural persons who were, now are, or shall become directors, officers or **LLC managers** or an equivalent position of the **organization**; and

**D.** **Employment related wrongful act** means a **wrongful act** arising from employment related activities including, but not limited to, hiring, training, supervision, evaluation, promotion, demotion, granting of tenure, and termination.

**E.** **Executive** means any natural person who was, now is or shall become the chief executive officer, chief financial officer, in-house general counsel or person of equivalent position to any of the foregoing of the **organization**.

**F.** **Financial impairment** means, with respect to the **organization** or any **outside organization**, the appointment of any receiver, conservator, liquidator, rehabilitator, trustee or similar official; or the **organization** or any **outside organization** becoming a **debtor in possession**.

**G.** **Insured** means the **organization** and the **insured persons**.

**H.** **Insured persons** means:

1. **Directors and officers**;

2. All natural persons who were, now are, or shall become members of a management committee or an advisory committee of the **organization**; and

3. All natural persons who were, now are, or shall become employees of the **organization**.

**I.** **LLC manager** means any natural person who is a manager, member of the board of managers or member of the **organization** that is a limited liability company, but only with respect to the conduct of the limited liability company's business. However, any member of a limited liability company who is a passive investor not involved in the operations of the limited liability company is not a **LLC manager**.

**J.** **Loss** means **defense costs** and the total amount of monetary damages which the **insured** becomes legally obligated to pay on account of any **claim** for a **wrongful act** with respect to which coverage hereunder applies, including damages, judgments, settlements, prejudgment and postjudgment interest, and punitive or exemplary damages or the multiplied portion of any multiplied damage award if insurable under the applicable law most favorable to the insurability of punitive, exemplary or multiplied damages

**Loss** shall not include:

1. Taxes, criminal or civil fines or penalties imposed by law;

2. Any restitution, disgorgement or similar sums; or

3. Any matter deemed uninsurable under the law pursuant to which this Coverage Part shall be construed.

**K.** **Organization** means the **named insured** and any **subsidiary**.

**L.** **Outside organization** means any nonprofit corporation, community chest, fund or foundation other than the **organization**, which is described in Section 501(c)(2), (3), (4), (6), (7), (8), (10), (19), or 501(d) of the Internal Revenue Code of 1986, as amended, and is exempt from federal income taxation.

**M.** **Outside position** means the service of any **insured person** of the **organization** as an officer or member of the board of directors, trustees, regents, managers, governors, or equivalent position in any **outside organization** but only during the time that such service is performed at the direction of the **organization** or with the consent and knowledge of the **organization**.

**N.** **Property damage** means:

**1.** Injury or damage, of any nature, to tangible or intangible property, including all resulting loss of use of that property; or

**2.** Loss of or loss of use of tangible or intangible property that is not otherwise injured or damaged.

**O.** **Third party** means any natural person who is not an **employee** of the **organization**.

**P.** **Wrongful act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted or allegedly committed or attempted on or after the Retroactive Date, if any, set forth in the Privately Held Company Directors and Officers Liability Coverage Part Declarations and prior to the end of the **policy period** by:

**1.** Any of the **insured persons** in the discharge of their duties solely in their capacity as **insured persons** of the **organization**;

**2.** Any of the **insured persons** of the **organization** in the discharge of their duties solely in their capacity in an **outside position** in any **outside organization**;

**3.** Any of the **insured persons** solely by reason of their status as such; or

**4.** The **organization**.

---

## SECTION III - EXCLUSIONS

The descriptions in the headings of these exclusions are solely for convenience and form no part of the terms and conditions of coverage.

**A.** Bodily/Personal Injury and Property Damage

We are not liable to pay, indemnify or defend any **claim** for actual or alleged:

**1.** Bodily injury, sickness, disease, or death of any person, mental anguish, or emotional distress;

**2.** **Property damage**, including, but not limited to, physical injury, loss of or loss of use of currency or any negotiable or non-negotiable instruments or contracts representing money; or

**3.** Invasion of privacy, wrongful entry, eviction, false arrest, false imprisonment, false detention, abuse of process, malicious prosecution, libel, slander, defamation, or disparaging of a person's or organization's goods, products or services.

**B.** Conduct

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, or in consequence of any of the **insureds** or any person for whose actions the **insureds** are legally responsible:

**1.** Committing any deliberately fraudulent act or omission;

**2.** Committing any willful violation of any statute or regulation; or

**3.** Gaining any profit, remuneration or advantage to which they were not legally entitled;

if established by a final and non-appealable judgment or adjudication in any underlying action or proceeding adverse to the **insureds** as to such conduct.

With respect to determining the applicability of this exclusion, no conduct pertaining to any **insured person** shall be imputed to any other **insured person**; however, any conduct pertaining to any **executive** shall be imputed to the **organization** to determine if coverage is available.

**C.** Contract

We are not liable to pay, indemnify or defend any **claim** for any actual or alleged liability of any **insureds** under the terms, conditions or warranties of any oral or written contract or agreement, except to the extent the liability would have attached to any such **insureds** in the absence thereof; provided, however, that this exclusion shall not apply to **defense costs** with respect to any **claim** against any **insured persons**.

**D.** Cyber

We are not liable to pay, indemnify or defend any **claim** for any actual or alleged:

**1.** Improper dissemination of personally identifiable information or protected health information;

2. Liability of any **insured** arising out of internet and electronic services which are performed for or on behalf of any client or customer of the **organization** through the transmission of electronic data to or from the **organization's** internet website or through a private computer network controlled by the **organization**; or

3. Liability of any **insured** for internet professional services the **organization** provides to others which may include, but are not limited to, application service provider, domain name registration services, electronic exchange and auction services, internet hosting services, internet media services, internet service provider service, managed and network security services, public key infrastructure services, search engine services, web portal services, website development, software development and internet access provider;

provided, however, that this exclusion shall not apply to any **claim** to which Insuring Agreement **A.** solely applies.

**E.** Employment Practices

We are not liable to pay, indemnify or defend any **claim** for an **employment related wrongful act**.

**F.** ERISA

We are not liable to pay, indemnify or defend any **claim** for any actual or alleged violation of the Employee Retirement Income Security Act of 1974, as amended or any rules, regulations or orders promulgated thereunder or any similar provisions of any federal, state or local statutory or common law in connection with any pension or welfare plan established for the benefit of employees of the **organization**.

**G.** Insured vs. Insured

We are not liable to pay, indemnify or defend any **claim** brought or maintained by, on behalf of or at the behest of any of the **insureds** in any capacity and regardless of collusion; provided, however, that this exclusion does not apply to:

1. Any **claim** brought or maintained as a derivative action on behalf of the **organization** by one or more persons who are not **insured persons** and who bring and maintain the **claim** without the solicitation, assistance or participation of any of the **insureds**;

2. Any **claim** brought or maintained by any of the **insureds** for contribution or indemnity, if such **claim** for contribution or indemnity directly results from another **claim** covered by the Coverage Part;

3. Any **claim** brought or maintained by an examiner, trustee, receiver, liquidator, rehabilitator, bankruptcy trustee or similar official, or creditors' committee of the **organization** in connection with a bankruptcy proceeding of the **organization**;

4. Any **claim** brought or maintained by **insured persons** of the **organization**:

   a. Who are **executives** or **directors and officers** who have not served as such for at least a one year period prior to the date the **claim** is first made and who bring and maintain the **claim** without the solicitation, assistance or participation of any **insured persons** who have served as **insured persons** within such one year period; or

   b. Other than **executives** or **directors and officers** if such **claim** is brought and maintained without any active assistance or participation of, or solicitation by, any **executives** or **directors and officers**; or

5. Any **claim** brought by a whistleblower pursuant to any federal, state, or local statutory or common law.

**H.** Intellectual Property

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, or in consequence of any actual or alleged infringement of copyright, patent, trademark, trade secret, service mark, trade name or misappropriation of ideas or trade secrets or other intellectual property rights; provided, however, that this exclusion shall not apply to any **claim** against any **insured persons**.

**I.** Outside Service

We are not liable to pay, indemnify or defend any **claim** for any **wrongful act** in the discharge of the duties of the **insured person** as a director, officer, trustee, employee or member of any entity other than the **organization**, even if directed or requested to serve such other entity by the **organization**; provided, however, that this exclusion shall not apply to the extent:

1. Such **claim** is based on the service of an **insured person** in an **outside position**; and

**ML 108 01 18**                                                                 **Page 5 of 7**

**2.** The **loss** resulting from such **claim** is not indemnified by the **outside organization** or any of its insurers.

**J.** Securities

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, or in consequence of any actual or alleged violation of:

**1.** The Securities Act of 1933, as amended or the Securities Exchange Act of 1934, as amended;

**2.** Any state Blue Sky or other state securities law applicable to publidy held shares; or

**3.** Any rule, regulation or order issued pursuant to any of the statutes set forth in Exclusions **III.J.1.** or **III.J.2.** of this Coverage Part, or any federal or state common law concerning such acts, laws, rules, regulations or orders;

provided, however, that this exclusion shall not apply to any **claim**:

**1.** Based upon or arising out of the offering, sale or purchase of securities, whether debt or equity, in a transaction or a series of transactions that are in fact in law exempt from registration under the Securities Act of 1933, the Securities Exchange Act of 1934, and any amendments thereto or any rules or regulations promulgated thereunder; or

**2.** Made by any securityholder of an **organization** for the failure of the **organization** to undertake or complete the initial public offering or sale of securities of the **organization** or for any **wrongful act** relating to an **organization's** preparation for any public offering, including any road show presentation to potential investors or other similar presentation, made by the **organization** and its **executives** via any medium in connection with such public offering, if such offering does not occur.

**K.** Third Party Discrimination or Sexual Harassment

We are not liable to pay, indemnify or defend any **claim** for any discrimination against or sexual harassment of any **third party**.

---

## SECTION IV - SEVERABILITY OF EXCLUSIONS

With respect to determining the applicability of the above exclusions, no **wrongful act** or knowledge possessed by any one of the **insureds** shall be imputed to any other **insureds** to determine if coverage is available, unless indicated otherwise.

---

## SECTION V - LIMIT OF INSURANCE AND DEDUCTIBLES

**A.** We will pay 100% of **loss** in excess of the applicable Deductible amount set forth in the Privately Held Company Directors and Officers Liability Coverage Part Declarations up to the Limit of Insurance set forth in the Privately Held Company Directors and Officers Liability Coverage Part Declarations, subject to the Shared Annual Aggregate Limit of Liability, if so set forth in the Common Policy Dedarations.

**B.** In the event a single **claim** is covered under more than one Insuring Agreement, the Deductibles set forth in the Privately Held Company Directors and Officers Liability Coverage Part Declarations shall be applied separately to the part of the **loss** resulting from such **claim** covered by each Insuring Agreement and the sum of the Deductibles so applied shall constitute the Deductible for each single **claim**; provided, however, that the total Deductible as finally determined shall in no event exceed the largest of the applicable Deductibles. Notwithstanding the aforementioned, the Deductible applicable to Insuring Agreement **B.** shall apply to **loss** payable under any of the Insuring Agreements for which indemnification by the **organization** is legally permissible whether or not actual indemnification is granted, unless the **organization** fails to indemnify any **insured person** due to the **financial impairment** of the **organization**. The Deductible shall be paid by the **organization**. Any **loss** paid by us within the Deductible shall be reimbursed by the **organization** within 30 days of our written request for such reimbursement.

**C.** **Defense costs** shall be part of and not in addition to the Limit of Insurance set forth in the Privately Held Company Directors and Officers Liability Coverage Part Declarations and the Shared Annual Aggregate Limit of Liability, if so set forth in the Common Policy Declarations. **Defense costs** we pay shall reduce such Limits of Insurance. **Defense costs** paid by the **insureds** shall be applied against the Deductible.

**D.** Our maximum aggregate liability for all **loss** resulting from all **claims** under this Coverage Part shall be the Limit of Insurance set forth in the Privately Held Company Directors and Officers Liability Coverage Part Declarations, subject to the Shared Annual Aggregate Limit of Liability, if so set forth in the Common Policy Dedarations.

**E.** If an Additional Defense Limit of Insurance is set forth in the Privately Held Company Directors and Officers Liability Coverage Part Declarations, **defense costs** will apply first to and reduce the Additional Defense Limit of Insurance. The Additional Defense Limit of Insurance will be in addition to and not part of the Limit of Insurance set forth in the Privately Held Company Directors and Officers Liability Coverage Part Declarations. The Additional Defense Limit of Liability is applicable to **defense costs** only. **Defense costs** paid by the **insureds** shall be applied against the Deductible.

Upon exhaustion of the Additional Defense Limit of Insurance, **defense costs** shall be part of and not in addition to the Limit of Insurance set forth in the Privately Held Company Directors and Officers Liability Coverage Part Declarations. **Defense costs** we pay shall reduce the Limit of Insurance.

**F.** If an Excess Side A Limit of Insurance is set forth in the Privately Held Company Directors and Officers Liability Coverage Part Declarations and if the Limit of Insurance has been exhausted, we provide the **insured persons** with an excess limit of insurance under Insuring Agreement **A.** Such Excess Side A Limit of Insurance will not exceed the amount set forth in the Privately Held Company Directors and Officers Liability Part Coverage Part Declarations. The Excess Side A Limit of Insurance is in addition to and not part of the Limit of Insurance, and it applies solely to **loss** resulting from any **claim** against an **insured person** to which Insuring Agreement **A.** is applicable.

**G.** It is agreed that:

**1.** If a **loss** from any **claim** is payable, but such payment would exceed the remaining applicable Limit of Insurance as set forth in the Privately Held Company Directors and Officers Liability Coverage Part Declarations, we will first pay the unpaid portion of such **loss** under Insuring Agreement **A.**; then to the extent that any amount of the applicable Limit of Insurance shall remain available, we will pay such **loss** to which Insuring Agreements **B.** and **C.** apply.

**2.** Upon written request of the President or Chairman of the Board of the **insured entity**, we shall withhold payment of a covered **loss** under Insuring Agreements **B.** and **C.** until the President or Chairman of the Board of the **insured entity** directs us to pay such covered **loss**. Such request shall not delay any payment under Insuring Agreement **A.**

## SECTION VI - DEFENSE, INVESTIGATION AND SETTLEMENT

**A.** We will have the right and duty to select counsel and defend the **insureds** against any **claim**; however, we will have no duty to defend the **insureds** against any **claim** to which this insurance does not apply.

**B.** We may make any investigation we deem necessary and may, with the consent of the **insureds** named in connection with the **claim**, make any settlement of any **claim** we deem expedient. If the **insureds** withhold consent to such settlement, our liability for all **loss** in connection with such **claim** shall not exceed:

**1.** The amount of the proposed settlement plus **defense costs** incurred up to the date of the **insured's** refusal to consent to the proposed settlement; plus

**2.** 90% of any settlement or judgment in excess of the proposed settlement amount referenced in **B.1.** above plus 90% of any **defense costs** incurred after the date the **insureds** refused to consent to the proposed settlement, subject in all events to the applicable Limit of Insurance and Deductible for such **claim**. The remaining 10% of any settlement or judgment in excess of the proposed settlement amount referenced in **B.1.** above plus 10% of any **defense costs** incurred after the date the **insureds** refused to consent to the proposed settlement shall be borne by the **insureds**, uninsured and at their own risk.

**C.** Our right and duty to defend end when we have used up the applicable Limit of Insurance in the defense or payment of damages, judgments or settlements of covered **claims**.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

<div style="border:1px solid black">

# CRISIS MANAGEMENT EMERGENCY RESPONSE EXPENSES ENDORSEMENT

</div>

This endorsement modifies insurance provided under the following:

**COMMUNITY ASSOCIATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**EDUCATORS LEGAL LIABILITY COVERAGE**
**FINANCIAL INSTITUTIONS DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**HEALTHCARE INSTITUTIONS DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**PRIVATELY HELD COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**PUBLICLY TRADED COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**

**A.  SECTION I - INSURING AGREEMENTS** is amended to include the following Insuring Agreement:

We will reimburse the **organization** for reasonable **crisis management emergency response expenses** incurred because of a **crisis incident** giving rise to a **crisis announcement** to which this insurance applies. We will reimburse only those reasonable **crisis management emergency response expenses** which are incurred during the **policy year** and reported to us within six months of the date the **crisis announcement** was initiated.

**B.  SECTION II - DEFINITIONS** is amended to include the following:

**Crisis announcement** means the public announcement that a **crisis incident** occurred on your premises or at an event sponsored by you.

**Crisis management emergency response expenses** mean those expenses incurred for services provided by a **crisis management firm**. However, **crisis management emergency response expenses** shall not include compensation, fees, benefits, overhead, charges or expenses of any **insured** or any of your **employees**, nor shall **crisis management emergency response expenses** include any expenses that are payable on your behalf or reimbursable to you under any other valid and collectible insurance.

**Crisis management firm** means any service provider the **organization** hires that is acceptable to us. Our consent will not be unreasonably withheld.

**Crisis incident** means an accident or other event resulting in death or serious bodily injury to three or more persons. **Crisis incident** shall also mean the accidental discharge of **pollutants**.

**C.  SECTION V - LIMIT OF INSURANCE AND DEDUCTIBLES** is amended to include the following:

The Aggregate Limit of Insurance for all **crisis management emergency response expenses** paid under this endorsed Insuring Agreement shall be __25,000__ per **policy year**. The Limit of Insurance provided by this endorsement is excess of, and applies in addition to, any similar coverage provided by any other endorsement attached to this Coverage Part, or by any other Coverage Part forming a part of the policy of insurance of which this Coverage Part forms a component.

No deductible shall apply to **crisis management emergency response expenses** paid under this endorsed Insuring Agreement.

All other provisions of the policy remain unchanged except as herein expressly modified.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## PROFESSIONAL LIABILITY EXCLUSION (SCHEDULED)

This endorsement modifies insurance provided under the following:

**COMMUNITY ASSOCIATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**EDUCATORS LEGAL LIABILITY COVERAGE**
**FINANCIAL INSTITUTIONS DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**HEALTHCARE INSTITUTIONS DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**PRIVATELY HELD COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**PUBLICLY TRADED COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**

**SECTION III - EXCLUSIONS** is amended to add the following:

We are not liable to pay, indemnify or defend any **claim** for the rendering of or failure to render any professional service which is shown in the **Schedule of Excluded Professional Services** below by or on behalf of any **insureds**.

**Schedule of Excluded Professional Services**

```
PROPERTY MANAGEMENT
CONSTRUCTION, DESIGN, MAINTENANCE OR PROJECT MANAGEMENT
```

All other provisions of the policy remain unchanged except as herein expressly modified.

**ML 329 01 16**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDED CYBER EXCLUSION

This endorsement modifies insurance provided under the following:

**COMMUNITY ASSOCIATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**EDUCATORS LEGAL LIABILITY COVERAGE**
**FINANCIAL INSTITUTIONS DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**PRIVATELY HELD COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**PUBLICLY TRADED COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**

**SECTION III – EXCLUSIONS, D.** is deleted in its entirety and replaced with the following:

**D.** Cyber

We are not liable to pay, indemnify or defend any **claim** for any actual or alleged:

1. Improper dissemination of personally identifiable information or protected health information or any violation of European Union General Data Protection Regulation, the California Consumer Privacy Act or any rules, regulations or orders promulgated thereunder or any similar provisions of any federal, state or local statutory or common law;

2. Liability of any **insured** for the transmission of malicious code or unauthorized access to any computer system; or use of the **organization's** computer system in a denial of service attack against a third party's computer system; or a denial of authorized electronic access to any computer system; or the disclosure or misappropriation of information that is subject to any form of confidentiality agreement or confidentiality provision in a contract or agreement between a third party and any **insured** or which the **insured** is legally required to maintain in confidence;

3. Liability of any **insured** for a failure to maintain adequate security controls to prevent a data breach or infiltration of the **insured's** computer system, including but not limited to ransomware and extortion;

4. Liability of any **insured** arising out of internet and electronic services which are performed for or on behalf of any client or customer of the **organization** through the transmission of electronic data to or from the **organization's** internet website or through a private computer network controlled by the **organization**;

5. Liability of any **insured** for internet professional services the **organization** provides to others which may include, but are not limited to, application service provider, domain name registration services, electronic exchange and auction services, internet hosting services, internet media services, internet service provider service, managed and network security services, public key infrastructure services, search engine services, web portal services, website development, software development and internet access provider; or

6. Liability of any **insured** for an intentional transfer of money, securities, goods, services or sensitive information to an unintended third party;

provided, however, that this exclusion shall not apply to any **claim** to which Insuring Agreement **A.** solely applies.

All other provisions of the policy remain unchanged except as herein expressly modified.

**ML 357 01 21**                                                                                              **Page 1 of 1**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## BIOMETRIC INFORMATION PRIVACY EXCLUSION

This endorsement modifies insurance provided under the following:

**COMMUNITY ASSOCIATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**EDUCATORS LEGAL LIABILITY COVERAGE**
**FINANCIAL INSTITUTIONS DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**HEALTHCARE INSTITUTIONS DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**PRIVATELY HELD COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**PUBLICLY TRADED COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**

**A.  SECTION II - DEFINITIONS** is amended to include the following:

**Biometric information** means any:

**a.**  Biometric identifier including a retina or iris scan, fingerprint, voiceprint, scan of hand or face geometry, or any other personally identifiable measurable biological characteristic of an individual; or

**b.**  Biometric information including any information, regardless of how it is captured, converted, stored or shared, based on an individual's biometric identifier used to identify an individual.

**Biometric information privacy claim** means a **claim** brought or maintained against an **insured** for a violation of any federal, state or local law that regulates or restricts the collection, storage, use and/or disposal of **biometric information**, including violations of any required notifications, disclosures, sale or authorizations related to such **biometric information**.

**B.  SECTION III - EXCLUSIONS** is amended to include the following:

Biometric Information Privacy

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of or in consequence of any actual or alleged **biometric information privacy claim.**

All other provisions of the policy remain unchanged except as herein expressly modified.

**ML 360 01 21**                                                                                          **Page 1 of 1**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SPLIT CLAIMS-MADE DATES ENDORSEMENT

This endorsement modifies insurance provided under the following:

**COMMUNITY ASSOCIATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**FINANCIAL INSTITUTIONS DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**HEALTHCARE INSTITUTIONS DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**PRIVATELY HELD COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**PUBLICLY TRADED COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**

The Directors and Officers Liability Coverage Part Declarations is amended with respect to the Retroactive Date, Prior or Pending Date and Continuity Date as indicated below; provided however, that such amendment indicated on this endorsement shall apply:

**A.** Solely with respect to that portion of the Limit of Insurance that is $750,000 excess of $250,000 :

| | |
|---|---|
| Retroactive Date: | N/A |
| Prior or Pending Date: | 09/11/2024 |
| Continuity Date: | 09/11/2024 |

**B.** Solely with respect to that portion of the Limit of Insurance that is $_____ excess of $_____:

| | |
|---|---|
| Retroactive Date: | |
| Prior or Pending Date: | |
| Continuity Date: | |

**C.** Solely with respect to that portion of the Limit of Insurance that is $_____ excess of $_____:

| | |
|---|---|
| Retroactive Date: | |
| Prior or Pending Date: | |
| Continuity Date: | |

**D.** Solely with respect to that portion of the Limit of Insurance that is $_____ excess of $_____:

| | |
|---|---|
| Retroactive Date: | |
| Prior or Pending Date: | |
| Continuity Date: | |

All other provisions of the policy remain unchanged except as herein expressly modified.

**ML 4242 01 21**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EARLY MEDIATION DEDUCTIBLE REDUCTION ENDORSEMENT

This endorsement modifies insurance provided under the following:

**COMMUNITY ASSOCIATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**EDUCATORS LEGAL LIABILITY COVERAGE**
**FINANCIAL INSTITUTIONS DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**HEALTHCARE INSTITUTIONS DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**PRIVATELY HELD COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**
**PUBLICLY TRADED COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**

**SECTION V - LIMIT OF INSURANCE AND DEDUCTIBLES** is amended to include the following:

If, prior to institution of arbitration proceedings or service of suit or within 60 days of the institution of such proceedings or service of suit, we and the **named insured** agree to use a process of non-binding intervention by a neutral third party to resolve any **claim** reported to us, and if such **claim** is resolved through such process, we will reduce the deductible applicable to such **claim** by 50% or $5,000, whichever is less.

All other provisions of the policy remain unchanged except as herein expressly modified.

**ML 4268 01 21**

**Page 1 of 1**
**bates p. 064**

# The Cincinnati Insurance Company

A Stock Insurance Company

# EMPLOYMENT PRACTICES LIABILITY
# COVERAGE PART DECLARATIONS

**THIS COVERAGE PART PROVIDES CLAIMS-MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD. TO THE EXTENT IT IS NOT OTHERWISE INDICATED, THE LIMIT OF INSURANCE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY DEFENSE COSTS, AND DEFENSE COSTS WILL BE APPLIED AGAINST THE DEDUCTIBLE. IN NO EVENT WILL WE BE LIABLE FOR DEFENSE COSTS OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE LIMIT OF INSURANCE. READ THE ENTIRE POLICY CAREFULLY.**

Policy Number: **EMP 072 63 42**

Named Insured is the same as it appears in the Common Policy Declarations unless another entry is made here.

| | | |
|---|---|---|
| Limit of Insurance: | $ **1,000,000** | in the aggregate |
| Optional Third Party Liability Sublimit | $ **1,000,000** | in the aggregate |
| Wage and Hour Defense Sublimit | $ **100,000** | in the aggregate |
| Immigration Defense Sublimit | $ **100,000** | in the aggregate |
| Additional Defense Limit of Insurance: | $ **NOT COVERED** | in the aggregate |

Deductibles:
$ **10,000** each **claim** under Insuring Agreement **A** (Employment Practices)
$ **10,000** each **claim** under Insuring Agreement **B** (Third Party)

| | |
|---|---|
| Retroactive Date: | **N/A** |
| Prior or Pending Date: | **10-01-2022** |
| Continuity Date: | **10-01-2022** |

Forms and endorsements applicable to this coverage part:

| | | |
|---|---|---|
| ML112 | 01/18 | EMPLOYMENT PRACTICES LIABILITY COVERAGE |
| ML4195 | 09/18 | NOTICE OF POST-EVENT SERVICES - WORKPLACE VIOLENCE EXPENSE COVERAGE |
| ML205 | 01/18 | WORKPLACE VIOLENCE EXPENSE COVERAGE ENDORSEMENT |
| ML361 | 01/21 | BIOMETRIC INFORMATION PRIVACY EXCLUSION |
| ML4214 | 01/21 | AMENDED DEFINITION OF INDEPENDENT CONTRACTORS AS INSURED PERSONS |
| ML4224 | 01/21 | EMPLOYEE PRIVACY VIOLATION ENDORSEMENT |
| ML4244 | 01/21 | SPLIT CLAIMS-MADE DATES ENDORSEMENT |
| ML4264 | 01/21 | CRISIS MANAGEMENT EXPENSE COVERAGE ENDORSEMENT - MASS OR CLASS ACTION |
| ML4269 | 01/21 | EARLY MEDIATION DEDUCTIBLE REDUCTION ENDORSEMENT |

**ML 512 01 16**

09-26-2024 00:49

# EMPLOYMENT PRACTICES LIABILITY COVERAGE
## TABLE OF CONTENTS

**Coverage Part Provision:**                                                              **Begins on Page:**

**SECTION I - INSURING AGREEMENTS** ............................................................................................2

**SECTION II - DEFINITIONS**............................................................................................................2

**SECTION III - EXCLUSIONS** ..........................................................................................................6

**SECTION IV - SEVERABILITY OF EXCLUSIONS** ..............................................................................7

**SECTION V - LIMIT OF INSURANCE AND DEDUCTIBLE** ..................................................................7

**SECTION VI - DEFENSE, INVESTIGATION AND SETTLEMENT** .........................................................8

**SECTION VII - SUPPLEMENTARY PAYMENTS**................................................................................8

# EMPLOYMENT PRACTICES LIABILITY COVERAGE

**THIS COVERAGE PART PROVIDES CLAIMS-MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD. TO THE EXTENT IT IS NOT OTHERWISE INDICATED, THE LIMIT OF INSURANCE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY DEFENSE COSTS, AND DEFENSE COSTS WILL BE APPLIED AGAINST THE DEDUCTIBLE. IN NO EVENT WILL WE BE LIABLE FOR DEFENSE COSTS OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE LIMIT OF INSURANCE. READ THE ENTIRE POLICY CAREFULLY.**

## SECTION I - INSURING AGREEMENTS

**A.** We will pay on behalf of the **insureds** all **loss** which they shall be legally obligated to pay resulting from any **employment claim** or **immigration claim** first made during the **policy period**, or any **extended reporting period** included in or endorsed to the policy, for an **employment wrongful act** or **immigration wrongful act**.

**B.** If Optional Third Party Liability is purchased as set forth in the Employment Practices Liability Coverage Part Declarations, we will pay on behalf of the **insureds** all **loss** which they shall be legally obligated to pay resulting from any **third party claim** first made during the **policy period**, or any **extended reporting period** included in or endorsed to the policy, for a **third party wrongful act**.

We will have the right and duty to select counsel and defend the **insureds** against any such **claim**.

## SECTION II - DEFINITIONS

Where set forth in bold type in this Coverage Part, whether in singular or in plural, the following terms shall have the meanings indicated.

**A.** **Benefits** means perquisites, fringe benefits, payments in connection with an employee benefit plan and any other payment, other than salary, wages or commissions to or for the benefit of an **employee** arising out of the employment relationship.

**B.** **Claim** means an **employment claim,** an **immigration claim** or a **third party claim**.

**C.** **Defense costs** means reasonable and necessary fees, costs, and expenses incurred by us or with our consent on behalf of the **insureds** or reimbursed to any of the **insureds** by us, resulting solely from the investigation, adjustment, defense and appeal of any **claim**. **Defense costs** includes, but is not limited to, the cost of expert consultants and witnesses, and premiums for appeal, injunction, attachment or supersedeas bonds (but not the obligation to furnish such bonds).

**Defense costs** shall not include:

**1.** Salaries, wages, fees, overhead or expenses of our employees or any **insureds**, directors, officers, trustees or employees, other than that portion of our employed attorneys' fees, salaries and expenses allocated to a specific **claim**;

**2.** Any amount covered by the duty to defend obligation of any other insurer; or

**3.** Any pre-tender fees, costs or expenses.

**D.** **Employee** includes, but is not limited to, full-time, part-time, seasonal, volunteer, contingent or leased workers as determined by the federal, state or local law. **Employee** does not include independent contractors as determined by federal, state or local law.

**E.** **Employment claim** means:

**1.** A written demand for monetary damages or non-monetary relief;

**2.** A civil proceeding commenced by the filing of a complaint or similar pleading;

**3.** A formal administrative or regulatory proceeding commenced by the filing of a complaint, charge, formal investigative order or similar document;

**4.** An arbitration, mediation or similar alternative dispute resolution proceeding (other than a labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement) if the **insured** is required or agrees to participate in such proceeding with our written consent;

**ML 112 01 18**

5.  In the context of an audit conducted by the Office of Federal Contract Compliance Programs, a Notice of Violation or Order to Show Cause or written demand for monetary or non-monetary relief, commenced by the receipt by an **insured** of such Notice, Order or written demand; or

6.  A written request to toll or waive a statute of limitations relating to a potential **employment claim** described in Definitions **E.1.** through **E.5.** above;

which is brought by or on behalf of any past, present or prospective **employee(s)** of the **organization** against any of the **insureds**, including any appeal therefrom.

F.  **Employment wrongful act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty committed for:

1.  Wrongful discharge, dismissal or termination of employment, including constructive discharge;

2.  Breach of any oral, written or implied employment contract or quasi-employment contract other than any labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement;

3.  Employment related misrepresentation;

4.  Violation of any federal, state or local law that concerns employment discrimination:

    a.  Including:

        1.  Sexual harassment involving unwelcome sexual advances, requests for sexual favors or other conduct of a sexual nature; or

        2.  Workplace bullying or workplace harassment of a non-sexual nature;

    b.  That:

        1.  Are made a condition of employment;

        2.  Are used as a basis for employment decisions; or

        3.  Create a work environment that is intimidating, offensive, hostile or interferes with performance;

5.  Wrongful failure to employ or promote;

6.  Wrongful demotion;

7.  Wrongful discipline;

8.  Wrongful deprivation of a career opportunity;

9.  Negligent hiring, supervision, promotion or retention;

10. Negligent evaluation;

11. Employment related **personal injury**;

12. Wrongful failure to grant tenure;

13. Employment related wrongful infliction of emotional distress;

14. Violation of the Family Medical Leave Act;

15. Wrongful **retaliation**;

16. Wrongful denial of training, denial or deprivation of seniority or evaluation;

17. Failure to adopt, create, provide or enforce adequate workplace or employment practices and procedures; or

18. Wrongful handling of any background check which is issued or expected to be used or collected in whole or in part for the purpose of serving as a factor in any employment related activities, including but not limited to any violation of the Fair Credit Reporting Act;

including any actual or alleged assault, battery, or loss of consortium in connection with Subparagraphs **1.** through **18.** above.

G.  **Executive** means any natural person who was, now is or shall become the chairperson, president, chief executive officer, chief financial officer, executive director, in-house general counsel or person of equivalent position to any of the foregoing of the **organization**.

**H.** **Immigration claim** means any criminal investigation of any **insured** by any governmental agency for any actual or alleged hiring of illegal aliens.

**I.** **Immigration wrongful act** means any actual or alleged violation of the Immigration Reform and Control Act of 1986 or any amendments to or rules, regulations or orders promulgated pursuant to it, or similar provisions of any federal, state, or local statutory or common law.

**J.** **Insured** means the **organization** and the **insured persons**.

**K.** **Insured persons** means:

1. All natural persons who were, now are, or shall become an officer or a duly elected or appointed member of the board of directors, trustees, regents, managers, governors, a **LLC manager** or an equivalent position of the **organization**;

2. All natural persons who were, now are, or shall become an **employee** or committee member, whether or not they were, are or shall be compensated, of the **organization**;

3. All natural persons who were, now are, or shall become members or volunteers of the **organization**, if the **organization** is nonprofit in nature,  while acting on behalf of the **organization** in a voluntary capacity at the direction of the board of directors, trustees, regents, managers, governors, or an equivalent position; and

4. Any natural person who is an independent contractor as determined by federal, state or local law, but only while acting in the capacity as such for the **organization** pursuant to an express written agreement between the independent contractor, or any entity on behalf of the independent contractor, and the **organization** and only if the **organization** agrees in writing to provide indemnification to such independent contractor; provided, however, that any coverage under this Coverage Part for any such independent contractor shall be excess of any indemnification or insurance otherwise available to such independent contractor from any other source;

but only for acts with respect to their duties for or service to the **organization**.

**L.** **LLC manager** means any natural person who was, now is or shall become a manager, member of the board of managers or member of the **organization** that is a limited liability company but only with respect to the conduct of the limited liability company's business.  However, any member of a limited liability company who is a passive investor not involved in the operations of the limited liability company is not a **LLC manager.**

**M.** **Loss** means **defense costs** and the total amount of monetary damages which the **insured** becomes legally obligated to pay on account of any **claim** for a **wrongful act** with respect to which coverage hereunder applies, including damages (including back pay and front pay), judgments, settlements, prejudgment and postjudgment interest, and punitive or exemplary damages or the multiplied portion of any multiplied damage award if insurable under the applicable law most favorable to the insurability of punitive, exemplary or multiplied damages.

**Loss** shall not include any amount for which an **insured** is not financially liable, compensation earned in the course of employment but not paid by an **insured** or matters which are deemed uninsurable under the law pursuant to which this Coverage Part shall be construed.

**Loss** shall not include, (other than **defense costs**):

1. **Benefits** or the equivalent value, however, this provision does not apply to **loss** resulting solely from wrongful termination of employment;

2. Amounts, which arise out of, are based upon, or are attributable to the employment reinstatement of the claimant by an **insured** or the continued employment of the claimant;

3. Future compensation, including salary or **benefits** for an **employee**, if the **insured** is ordered in accordance with a judgment or other final adjudication but fails to reinstate the claimant as an **employee**;

4. That part of any express contract of employment or an express obligation to make payments in the event of the termination of employment;

5. Salary, wages, commissions, **benefits** or other monetary payments which constitute severance payments or payments pursuant to a notice period;

6. Civil or criminal fines or penalties imposed by law, liquidated damages (other than liquidated damages awarded under the Age Discrimination in Employment Act or the Equal Pay Act), payroll or other taxes, or damages, penalties or types of relief deemed uninsurable under applicable law;

   **7.** Future compensation, including salary or **benefits** for an **employee** who has been or will be hired, promoted or reinstated to employment pursuant to a settlement, court order, judgment, award or other resolution of a **claim**; or

   **8.** Medical, pension, disability, life insurance, stock option or other **employee** type **benefit**.

**N.** **Organization** means the **named insured** and any **subsidiary**.

**O.** **Personal injury** means injury, other than bodily injury, arising out of one or more of the following offenses:

   **1.** False arrest, detention or imprisonment;

   **2.** Oral or written publication of material that libels, slanders or defames a past, present or prospective **employee**;

   **3.** Invasion of a past, present or prospective **employee's** right of privacy;

   **4.** Malicious prosecution; or

   **5.** Abuse of process.

**P.** **Property damage** means:

   **1.** Injury or damage, of any nature, to tangible or intangible property, including all resulting loss of use of that property; or

   **2.** Loss of or loss of use of tangible or intangible property that is not otherwise injured or damaged.

**Q.** **Retaliation** means any actual or alleged wrongful termination of employment or other adverse employment action against a claimant with respect to any person's exercise or attempted exercise of rights protected by law, refusal to violate any law, disclosure or threat of disclosure to a superior or to any governmental agency actual or alleged violations of the law, or having assisted or testified in or cooperated with a proceeding or investigation regarding alleged violations of law.

**R.** **Third party** means any natural person who is not an **employee** of the **organization**.

**S.** **Third party claim** means:

   **1.** A written demand for monetary damages or non-monetary relief;

   **2.** A civil proceeding commenced by the filing of a complaint or similar pleading;

   **3.** A formal administrative or regulatory proceeding commenced by the filing of a complaint, charge, formal investigative order or similar document;

   **4.** An arbitration, mediation or similar alternative dispute resolution proceeding (other than a labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement) if the **insured** is required or agrees to participate in such proceeding with our written consent; or

   **5.** A written request to toll or waive a statute of limitations relating to a potential **third party claim** described in Definitions **S.1.** through **S.4.** above;

which is brought by or on behalf of any **third party** against any of the **insureds**, including any appeal therefrom.

**T.** **Third party wrongful act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted or allegedly committed or attempted on or after the Retroactive Date, if any, set forth in the Employment Practices Liability Coverage Part Declarations and prior to the end of the **policy period** by an **insured** or any person for whose acts the **insured** is legally liable for:

   **1.** Discrimination by any **insured** against a **third party** in violation of any applicable federal, state or local statute, ordinance or common law;

   **2.** Sexual or other harassment by any **insured**, including unwelcome sexual advances, requests for sexual favors or other conduct of a sexual nature against a **third party** which violates the civil rights of the **third party**; or

   **3.** **Wrongful eviction** when arising out of discrimination or harassment by any **insured** against a **third party** in violation of any applicable federal, state or local statute, ordinance or common law.

**U.** **Wrongful act** means an **employment wrongful act**, an **immigration wrongful act** or a **third party wrongful act** attempted or allegedly committed or attempted on or after the Retroactive Date, if any, set

forth in the Employment Practices Liability Coverage Part Declarations and prior to the end of the **policy period** by an **insured** or any person for whose acts the **organization** is legally liable.

**V.** **Wrongful eviction** means the act of dispossessing or attempting to dispossess a **third party** of real property to which such **third party** claims a right to occupy, and such real property is owned, operated or controlled by the **organization**.

## SECTION III - EXCLUSIONS

The descriptions in the headings of these exclusions are solely for convenience and form no part of the terms and conditions of coverage.

**A.** Exclusions applicable to **loss** other than **defense costs**:

**1.** Americans With Disabilities Act

This insurance does not apply to **loss** incurred by the **insured** in making physical changes, modifications, alterations, or improvements as part of an accommodation pursuant to the Americans With Disabilities Act or similar provisions of any federal, state or local statutory or common law; provided, however, that this exclusion does not apply to **defense costs**.

**2.** Wage and Hour (with Defense Sublimit)

This insurance does not apply to any **claim** based upon, arising out of or in consequence of the Fair Labor Standards Act (except the Equal Pay Act) or any amendments to or rules, regulations or orders promulgated pursuant to it, or similar provisions of any federal, state, or local statutory or common law; except we shall reimburse the **insureds** for up to a maximum payment of the Wage and Hour Defense Sublimit set forth in the Employment Practices Liability Coverage Part Declarations in **defense costs** that exceed the Deductible amount as set forth in the Employment Practices Liability Coverage Part Declarations. Any payment of **defense costs** shall be part of and not in addition to the Limit of Insurance set forth in the Employment Practices Liability Coverage Part Declarations and such payment reduces the Limit of Insurance. However, this exclusion shall not apply to an **employment claim** for retaliatory treatment of a person with respect to actual or threatened disclosures by such person of any actual or alleged violation of the Fair Labor Standards Act by any **insured**.

**3.** Immigration (with Defense Sublimit)

This insurance does not apply to any **immigration claim** except we shall reimburse the **insureds** for up to a maximum payment of the Immigration Claim Defense Sublimit set forth in the Employment Practices Liability Coverage Part Declarations in **defense costs** that exceed the Deductible amount as set forth in the Employment Practices Liability Coverage Part Declarations. Any payment of **defense costs** shall be part of and not in addition to the Limit of Insurance set forth in the Employment Practices Liability Coverage Part Declarations and such payment reduces the Limit of Insurance. However, this exclusion shall not apply to an **employment claim** for retaliatory treatment of a person with respect to actual or threatened disclosures by such person of any actual or alleged violation of the Immigration Reform and Control Act of 1986 by any **insured**.

**B.** Exclusions applicable to all **loss**:

**1.** Bodily Injury/Property Damage

We are not liable to pay, indemnify or defend any **claim** for actual or alleged:

   **a.** Bodily injury, sickness, disease, or death of any person; or

   **b.** **Property damage**, including, but not limited to, physical injury, loss of or loss of use of currency or any negotiable or non-negotiable instruments or contracts representing money.

**2.** COBRA, ERISA, NLRA, OSHA and WARN (with Retaliation Carve Back)

This insurance does not apply to any **claim** based upon, arising out of or in consequence of the:

   **a.** Consolidated Omnibus Budget Reconciliation Act of 1985;

   **b.** Employee Retirement Income Security Act of 1974 (except Section 510 thereof);

   **c.** National Labor Relations Act (including the Labor Management Relations Act of 1947);

   **d.** Occupational Safety and Health Act;

**ML 112 01 18**

**e.** Worker Adjustment and Retraining Notification Act; or

any amendments to or rules, regulations or orders promulgated pursuant to these laws, or similar provisions of any federal, state, or local statutory or common law. However, this exclusion shall not apply to any **employment claim** for retaliatory treatment of a person with respect to actual or threatened disclosures by such person of any actual or alleged violation of the acts described in **B.2.a.** through **B.2.e.** above by any **insured**.

**3.** Contractual (Other than Employment Contract)

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of or in consequence of any actual or alleged liability of any **insureds** under the terms, conditions or warranties of any oral or written contract or agreement, except:

**a.** To the extent the liability would have attached to any such **insureds** in the absence thereof; or

**b.** With respect to any **claim** for breach of an employment contract.

**4.** Labor Relations

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of or in consequence of any actual or alleged:

**a.** Labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement; or

**b.** **Wrongful act** committed, attempted, or allegedly committed or attempted concurrent with or after a lockout, strike, picket line, replacement or other similar actions resulting from labor disputes or labor negotiations.

**5.** Workers' Compensation, Unemployment, Social Security and Disability (with Retaliation Carve Back)

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of or in consequence of any actual or alleged obligation of any **insured** under any workers' compensation, unemployment insurance, social security, disability benefits or similar law, or derivative actions arising out of any of these. However, this exclusion shall not apply to any **employment claim** for retaliatory treatment by an **insured** due to the exercise of rights granted under any such law.

## SECTION IV - SEVERABILITY OF EXCLUSIONS

With respect to determining the applicability of the above exclusions, no **wrongful act** or knowledge possessed by any one of the **insureds** shall be imputed to any other **insureds** to determine if coverage is available, unless indicated otherwise.

## SECTION V - LIMIT OF INSURANCE AND DEDUCTIBLE

**A.** The Limits of Insurance shown in the Employment Practices Liability Coverage Part Declarations and the rules below fix the most we will pay regardless of the number of:

**1.** **Insureds** under this Coverage Part;

**2.** **Claims** made or suits brought on account of **wrongful acts** or otherwise; or

**3.** Persons or organizations making **claims** or bringing suits.

**B.** Our liability shall apply only to that part of each covered **loss** which is excess of the Deductible amount specified in the Employment Practices Liability Coverage Part Declarations and such Deductible amount shall be borne by the **insureds**.

**C.** **Defense costs** incurred by us or by the **insured** with our written consent are part of and not in addition to the Limit of Insurance set forth in the Employment Practices Liability Coverage Part Declarations and the Shared Annual Aggregate Limit of Liability, if so set forth in the Common Policy Declarations. **Defense costs** we pay shall reduce such Limits of Insurance. **Defense costs** paid by the **insureds** shall be applied against the Deductible.

**D.** Our maximum aggregate liability for all **loss** resulting from all **claims** under this Coverage Part shall be the Limit of Insurance set forth in the Employment Practices Liability Coverage Part Declarations, subject to the Shared Annual Aggregate Limit of Liability, if so set forth in the Common Policy Declarations.

**E.**   If an Additional Defense Limit of Insurance is set forth in the Employment Practices Liability Coverage Part Declarations, **defense costs** will apply first to and reduce the Additional Defense Limit of Insurance. The Additional Defense Limit of Insurance will be in addition to, and not part of the Limit of Insurance set forth in the Employment Practices Liability Coverage Part Declarations. The Additional Defense Limit of Liability is applicable to **defense costs** only. **Defense costs** paid by the **insureds** shall be applied against the Deductible.

Upon exhaustion of the Additional Defense Limit of Insurance, **defense costs** shall be part of and not in addition to the Limit of Insurance set forth in the Employment Practices Liability Coverage Part Declarations. **Defense costs** we pay shall reduce the Limit of Insurance.

## SECTION VI - DEFENSE, INVESTIGATION AND SETTLEMENT

**A.**   We will have the right and duty to select counsel and defend the **insureds** against any **claim**; however, we will have no duty to defend the **insureds** against any **claim** to which this insurance does not apply.

**B.**   We may make any investigation we deem necessary and may, with the consent of the **insureds** named in connection with the **claim**, make any settlement of any **claim** we deem expedient. If the **insureds** withhold consent to such settlement, our liability for all **loss** in connection with such **claim** shall not exceed:

**1.**   The amount of the proposed settlement plus **defense costs** incurred up to the date of the **insured's** refusal to consent to the proposed settlement; plus

**2.**   90% of any settlement or judgment in excess of the proposed settlement amount referenced in **B.1.** above plus 90% of any **defense costs** incurred after the date the **insureds** refused to consent to the proposed settlement, subject in all events to the applicable Limit of Insurance and Deductible for such **claim**. The remaining 10% of any settlement or judgment in excess of the proposed settlement amount referenced in **B.1.** above plus 10% of any **defense costs** incurred after the date the **insureds** refused to consent to the proposed settlement shall be borne by the **insureds**, uninsured and at their own risk.

**C.**   Our right and duty to defend end when we have used up the applicable Limit of Insurance in the defense or payment of damages, judgments or settlements of covered **claims**.

## SECTION VII - SUPPLEMENTARY PAYMENTS

We will pay with respect to any **claim** we defend:

**A.**   The cost of any appeal bond, attachment bond, or any similar bond, but only for bond amounts within the applicable Limit of Insurance; provided, however, that we do not have to apply for or furnish these bonds; and

**B.**   All reasonable expenses incurred by the **insured** at our request to assist us in the investigation or defense of the **claim**, including actual loss of earnings up to $250 a day because of time off from work.

These payments will not reduce the Limits of Insurance.

# NOTICE OF POST-EVENT SERVICES -
# WORKPLACE VIOLENCE EXPENSE COVERAGE

Your policy includes valuable workplace violence expense coverage from the Cincinnati Insurance Company. In the event of a workplace violence event, you may utilize an outside vendor to assist your organization. The associated workplace violence expenses may be covered by your policy. The Cincinnati Insurance Company has teamed with Black Swan Solutions. A crisis management service through Empathia, Inc., Black Swan is a leader in supporting organizations affected by crisis and can provide policyholders with services following a workplace violence event. While you have no obligation to use the services of Black Swan Solutions, they are available if you want to consult with an outside vendor. However, if you opt to use the services of another organization or choose not to utilize an outside vendor, it will not impact your coverage under the Workplace Violence Expense Coverage Endorsement.

Black Swan Solutions offers a variety of services. Some expenses related to these services may be covered by your policy and some may not. The final determination of any expense reimbursement coverage will come from the Cincinnati Insurance Company. Black Swan Solutions can also engage in pre-event consulting, but such an expense would be borne solely by you.

**The Cincinnati Insurance Company Workplace Violence Post-Event Hotline**, monitored by Black Swan Solutions, is available to help your organization and your employees after a workplace violence event. You can contact Black Swan Solutions any time of day or night by calling our 24 hour hotline: 877-841-1082.

**Use of Workplace Violence Post-Event Hotline will not be deemed to satisfy any notice of claim or notice of workplace violence event provision contained in any policy. The selection of a vendor is the independent choice of the policyholder. The Cincinnati Insurance Company makes no warranties and assumes no liability for services, products, or loss control measures provided by Black Swan Solutions.**

**ML 4195 09 18**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

<div style="border:2px solid black; text-align:center">

# WORKPLACE VIOLENCE EXPENSE COVERAGE ENDORSEMENT

</div>

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY COVERAGE**

A. **SECTION I - INSURING AGREEMENTS** is amended to include the following Insuring Agreement:

We will reimburse all **workplace violence expenses** sustained by the **organization** as a result of a **workplace violence event** occurring during the **policy period** and reported to us as soon as practicable but in no event after the expiration of the policy or any **extended reporting period** included in or endorsed to this Coverage Part.

B. **SECTION II - DEFINITIONS** is amended to include the following:

1. **Business interruption expense** means:

   a. The excess of revenues over expenses, if any, that would have been earned by the **organization** had no **workplace violence event** occurred; and

   b. The reasonable costs and expenses that would not have been incurred by the **organization** except for a **workplace violence event** with the sole purpose to:

      (1) Continue the activities necessary for the organization to resume operations to substantially the same level that existed immediately prior to the **workplace violence event**; or

      (2) Reduce any **business interruption expense**, not to exceed the amount of actual reduction of such **business interruption expense.**

   However, **business interruption expense** shall be reduced by all recoveries, other insurance, suretyship and other indemnity which cover **business interruption expense**. Additionally, **business interruption expense** shall be reduced by the amount by which the organization reasonably could have reduced **business interruption expense** but fails to do so.

2. **Premises** means any building, facility or property occupied by the **organization** in the conduct of its business.

3. **Workplace violence event** means any actual or alleged intentional and unlawful:

   a. Use of deadly force; or

   b. Threat of deadly force involving the display of a lethal weapon;

   which occurs on **premises** and which did or could result in bodily injury or death to an **insured person**.

4. **Workplace violence expenses** means the reasonable fees, costs and expenses for:

   a. The services of an independent security consultant for up to 90 days following a **workplace violence event**;

   b. The services of an independent public relations consultant for up to 90 days following a **workplace violence event**;

   c. Counseling services provided to **insured persons** by an independent counselor on **premises** for up to 120 days following a **workplace violence event**;

   d. Independent security guards and other reasonable costs to secure the **premises** for up to 30 days following a **workplace violence event**;

   e. The services of an independent forensic analyst for up to 120 days following a **workplace violence event**;

**ML 205 01 18**                                                                 **Page 1 of 2**

    **f.**   The salaries or wages for up to 90 days following a **workplace violence event** paid by the **organization** to **insured persons** victimized by a **workplace violence event** and unable to work because of such **workplace violence event**; and

    **g.**   **Business interruption expense** until the earlier of 90 days following a **workplace violence event** or until the organization restores operations to substantially the same level that existed immediately prior to the **workplace violence event.**

**C.**  **SECTION III - EXCLUSIONS, B.** is amended to include the following:

    **1.**  Robbery

      This insurance does not apply to any **workplace violence event** based upon, arising out of or in consequence of a purpose of demanding money, securities or property.

    **2.**  Riot

      This insurance does not apply to any **workplace violence event** based upon, arising out of or in consequence of riot, civil upheaval or civil unrest.

**D.**  **SECTION V - LIMIT OF INSURANCE AND DEDUCTIBLE** is amended to include the following:

    **1.**  The Aggregate Limit of Insurance for all **workplace violence expenses** paid under this endorsed Insuring Agreement shall be $ <u>250,000</u> per **policy year** and shall apply as indicated by ☒ below:

      ☒  This separate limit shall be in addition to and not part of the Limit of Insurance set forth in the Employment Practices Liability Coverage Part Declarations.

      ☐  This sublimit shall be part of and not in addition to the Limit of Insurance set forth in the Employment Practices Liability Coverage Part Declarations.

    **2.**  No deductible shall apply to **workplace violence expenses** paid under this endorsed Insuring Agreement.

All other provisions of the policy remain unchanged except as herein expressly modified.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## BIOMETRIC INFORMATION PRIVACY EXCLUSION

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY COVERAGE**

**A.   SECTION II - DEFINITIONS** is amended to include the following:

**Biometric information** means any:

**a.**   Biometric identifier including a retina or iris scan, fingerprint, voiceprint, scan of hand or face geometry, or any other personally identifiable measurable biological characteristic of an individual; or

**b.**   Biometric information including any information, regardless of how it is captured, converted, stored or shared, based on an individual's biometric identifier used to identify an individual.

**Biometric information privacy claim** means a **claim** brought or maintained against an **insured** for a violation of any federal, state or local law that regulates or restricts the collection, storage, use and/or disposal of **biometric information,** including violations of any required notifications, disclosures, sale or authorizations related to such **biometric information.**

**B.   SECTION III - EXCLUSIONS, B.** is amended to include the following:

<u>Biometric Information Privacy</u>

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of or in consequence of any actual or alleged **biometric information privacy claim.** However, this exclusion shall not apply to an **employment claim** for retaliatory treatment of a person with respect to actual or threatened disclosures by such person of any actual or alleged violation regarding a **biometric information privacy claim** by any **insured**.

All other provisions of the policy remain unchanged except as herein expressly modified.

**ML 361 01 21**                                                                                                              **Page 1 of 1**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDED DEFINITION OF INDEPENDENT CONTRACTORS AS INSURED PERSONS

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY COVERAGE**

**SECTION II - DEFINITIONS, K., 4.** is deleted in its entirety and replaced by the following:

**4.** Any natural person who is an independent contractor as determined by federal, state or local law, but only while acting in the capacity as such for the **organization** pursuant to an express written agreement between the independent contractor, or any entity on behalf of the independent contractor, and the **organization** and only if in the event of a **claim** the **organization** requests to us in writing to provide indemnification to such independent contractor.

All other provisions of the policy remain unchanged except as herein expressly modified.

**ML 4214 01 21**                                                                 **Page 1 of 1**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EMPLOYEE PRIVACY VIOLATION ENDORSEMENT (DEFENSE COSTS ONLY WITH SUBLIMIT)

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY COVERAGE**

A.  **SECTION II - DEFINITIONS, F.** is amended to include the following:

**Employment wrongful act** shall also mean any actual or alleged **employee privacy violation** committed, attempted, or allegedly committed or attempted by an **insured** while acting in the capacity as such.

B.  **SECTION II - DEFINITIONS** is amended to add the following:

**Employee privacy violation** means an **insured's** failure to:

1.  Secure an employee's **record** from actual or potential unauthorized access by another person or entity which results in injury to such **employee**; or

2.  Provide notice as required by any state, federal or local statutory law or common law to an **employee** whose **record** was accessed or may have been accessed by an unauthorized person.

**Record** means an **employee's** first name or first initial, and last name, in combination with:

1.  Their social security number, driver's license number or other personal identification number (including an employee identification number or student identification number);

2.  Their financial account number (including a bank account number, retirement account number, or healthcare spending account number);

3.  Their credit, debit or other payment card number; or

4.  Any personally identifiable health information, pursuant to the Health Insurance Portability and Accountability Act of 1996, held by the **organization**,

when any such information in **1.** through **4.** above is intended by the **organization** to be accessible only by persons or entities specifically authorized by the **organization** to have access to such information.

C.  **SECTION III - EXCLUSIONS** is amended to include the following:

This insurance does not apply to any **claim** based upon, arising out of or in consequence of an **employee privacy violation**; except we shall reimburse the **insured** for up to a maximum payment of $250,000 for **defense costs** that exceed the Deductible amount as set forth in the Employment Practices Liability Coverage Part Declarations. Any payment of **defense costs** shall be part of and not in addition to the Limit of Insurance set forth in the Employment Practices Liability Coverage Part Declarations and such payment reduces the Limit of Insurance. However, this exclusion shall not apply to an **employment claim** for retaliatory treatment of a person with respect to actual or threatened disclosures by such person of any actual or alleged **employee privacy violation** by any **insured**.

All other provisions of the policy remain unchanged except as herein expressly modified.

ML 4224 01 21 **Page 1 of 1**
bates p. 080

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SPLIT CLAIMS-MADE DATES ENDORSEMENT

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY COVERAGE**

The Employment Practices Liability Coverage Part Declarations is amended with respect to the Retroactive Date, Prior or Pending Date and Continuity Date as indicated below; provided however, that such amendment indicated on this endorsement shall apply:

**A.** Solely with respect to that portion of the Limit of Insurance that is $<u>750,000</u> excess of $<u>250,000</u>:

| | |
|---|---|
| Retroactive Date: | <u>N/A</u> |
| Prior or Pending Date: | <u>09/11/2024</u> |
| Continuity Date: | <u>09/11/2024</u> |

**B.** Solely with respect to that portion of the Limit of Insurance that is $_____ excess of $_____:

| | |
|---|---|
| Retroactive Date: | _____ |
| Prior or Pending Date: | _____ |
| Continuity Date: | _____ |

**C.** Solely with respect to that portion of the Limit of Insurance that is $_____ excess of $_____:

| | |
|---|---|
| Retroactive Date: | _____ |
| Prior or Pending Date: | _____ |
| Continuity Date: | _____ |

**D.** Solely with respect to that portion of the Limit of Insurance that is $_____ excess of $_____:

| | |
|---|---|
| Retroactive Date: | _____ |
| Prior or Pending Date: | _____ |
| Continuity Date: | _____ |

All other provisions of the policy remain unchanged except as herein expressly modified.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CRISIS MANAGEMENT EXPENSE COVERAGE ENDORSEMENT - MASS OR CLASS LAWSUIT

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY COVERAGE**

**A.** **SECTION I - INSURING AGREEMENTS** is amended to include the following Insuring Agreement:

We will reimburse all **crisis management expenses** sustained by the **insureds** as a result of a **crisis management event** occurring during the **policy period** and reported to us as soon as practicable but in no event later than 30 days after the commencement of such **crisis management event**, the expiration of the policy or any **extended reporting period** included in or endorsed to this Coverage Part.

**B.** **SECTION II - DEFINITIONS** is amended to include the following:

**1.** **Crisis management event** means an allegation of:

**a.** An **employment wrongful act** which the **organization's** director of human resources, in-house general counsel, or person of equivalent position reasonably believes that such **employment wrongful act** will result in a **mass or class lawsuit**; or

**b.** **Employment harassment** by a director, officer, **LLC manager** or an equivalent position of the **insured** which the **insured's** director of human resources, in-house general counsel, or person of equivalent position reasonably believes that such **employment harassment** will result in a **claim**.

**2.** **Crisis management expenses** means the reasonable and necessary cost of retaining, for a stipulated period of time with our prior approval, an independent public relations consultant, media management consultant, investigative firm or law firm, and the cost of advertising and public relations media and activities in connection with a **crisis management event**. **Crisis management expenses** shall not mean:

**a.** Revising or rewriting of personnel policies or procedures;

**b.** The cost of sensitivity or awareness training; or

**c.** Accommodations made by the **insured** pursuant to the Americans with Disabilities Act.

**3.** **Employment harassment** means:

**a.** Sexual harassment involving unwelcome sexual advances, requests for sexual favors or other conduct of a sexual nature that are made a condition of employment, are used as a basis for employment decisions or create a work environment that is intimidating, offensive, hostile or interferes with performance; or

**b.** Workplace bullying or workplace harassment of a non-sexual nature.

**4.** **Mass or class action** means any **claim** brought or maintained:

**a.** By or on behalf of five or more natural persons who are acting in concert, whether or not such natural persons are represented by one or more legal counsel;

**b.** By or on behalf of one to four natural persons if any of such natural persons are making a pattern and practice or systemic discrimination allegation and are seeking monetary relief on behalf of a class or group of complainants in order to resolve such **claim**, whether or not such natural persons are represented by one or more legal counsel; or

**c.** By a governmental entity, department or agency making a pattern and practice or systemic discrimination allegation or seeking monetary relief on behalf of a class or group of complainants in order to resolve such **claim**.

**ML 4264 01 21**                                                                                   **Page 1 of 2**

**C.** **SECTION V - LIMIT OF INSURANCE AND DEDUCTIBLE** is amended to include the following:

**1.** The Aggregate Limit of Insurance for all **crisis management expenses** paid under this endorsed Insuring Agreement shall be $10,000 per **policy year**. This sublimit shall be part of and not in addition to the Limit of Insurance set forth in the Employment Practices Liability Coverage Part Declarations.

**2.** No deductible shall apply to **crisis management expenses** paid under this endorsed Insuring Agreement.

All other provisions of the policy remain unchanged except as herein expressly modified.

ML 4264 01 21

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EARLY MEDIATION DEDUCTIBLE REDUCTION ENDORSEMENT

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY COVERAGE**

**SECTION V - LIMIT OF INSURANCE AND DEDUCTIBLE** is amended to include the following:

If, prior to institution of arbitration proceedings or service of suit or within 60 days of the institution of such proceedings or service of suit, we and the **named insured** agree to use a process of non-binding intervention by a neutral third party to resolve any **claim** reported to us, and if such **claim** is resolved through such process, we will reduce the deductible applicable to such **claim** by 50% or $5,000, whichever is less.

All other provisions of the policy remain unchanged except as herein expressly modified.

**ML 4269 01 21**

# The Cincinnati Insurance Company

A Stock Insurance Company

# FIDUCIARY LIABILITY
# COVERAGE PART DECLARATIONS

**THIS COVERAGE PART PROVIDES CLAIMS-MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD. TO THE EXTENT IT IS NOT OTHERWISE INDICATED, THE LIMIT OF INSURANCE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY DEFENSE COSTS, AND DEFENSE COSTS WILL BE APPLIED AGAINST THE DEDUCTIBLE. IN NO EVENT WILL WE BE LIABLE FOR DEFENSE COSTS OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE LIMIT OF INSURANCE. READ THE ENTIRE POLICY CAREFULLY.**

Policy Number: **EMP 072 63 42**

Named Insured is the same as it appears in the Common Policy Declarations unless another entry is made here.

| | | |
|---|---|---|
| Limit of Insurance: | $ **1,000,000** | in the aggregate |
| Voluntary Settlement Program Sublimit | $ **250,000** | in the aggregate |
| HIPAA Sublimit | $ **250,000** | in the aggregate |
| Pension Protection Act Sublimit | $ **250,000** | in the aggregate |
| ERISA 502(c) Sublimit | $ **250,000** | in the aggregate |
| Healthcare Reform Sublimit | $ **250,000** | in the aggregate |
| Section 4975 Sublimit | $ **250,000** | in the aggregate |
| Additional Defense Limit of Insurance: | $ **NOT COVERED** | in the aggregate |
| Deductible: | $ **0** | each **claim** |
| Retroactive Date: | **N/A** | |
| Prior or Pending Date: | **09-11-2024** | |
| Continuity Date: | **09-11-2024** | |

Forms and endorsements applicable to this coverage part:
**ML113    01/18 FIDUCIARY LIABILITY COVERAGE**

ML 513 01 18

`09-26-2024 00:49`

EMP 072 63 42
**bates p. 086**

# FIDUCIARY LIABILITY COVERAGE

## TABLE OF CONTENTS

**Coverage Part Provision:**                                                          **Begins on Page:**

**SECTION I - INSURING AGREEMENTS** ...............................................................................2

**SECTION II - DEFINITIONS** ...........................................................................................2

**SECTION III - EXCLUSIONS** .........................................................................................5

**SECTION IV - SEVERABILITY OF EXCLUSIONS** ..................................................................6

**SECTION V - LIMIT OF INSURANCE AND DEDUCTIBLE** .........................................................6

**SECTION VI - DEFENSE, INVESTIGATION AND SETTLEMENT** ..................................................7

**SECTION VII - FORMATION, ACQUISITION OR TERMINATION OF AN EMPLOYEE BENEFIT PLAN**..7

**SECTION VIII - WAIVER OF RIGHT OF RECOURSE** ..............................................................8

# FIDUCIARY LIABILITY COVERAGE

**THIS COVERAGE PART PROVIDES CLAIMS-MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD. TO THE EXTENT IT IS NOT OTHERWISE INDICATED, THE LIMIT OF INSURANCE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY DEFENSE COSTS, AND DEFENSE COSTS WILL BE APPLIED AGAINST THE DEDUCTIBLE. IN NO EVENT WILL WE BE LIABLE FOR DEFENSE COSTS OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE LIMIT OF INSURANCE. READ THE ENTIRE POLICY CAREFULLY.**

## SECTION I - INSURING AGREEMENTS

**A.** We will pay on behalf of the **insureds** all **loss** which they shall be legally obligated to pay resulting from any **claim** first made during the **policy period**, or any **extended reporting period** included in or endorsed to the policy, for a **wrongful act**. We will have the right and duty to defend the **insureds** against any such **claim**.

**B.** We will pay on behalf of the **insureds** the **settlement fees** and **defense costs** in an amount not to exceed the Voluntary Settlement Program Sublimit set forth in the Fiduciary Liability Coverage Part Declarations with respect to a **settlement program notice**; provided we shall pay no **settlement fees** to satisfy or settle any investigation or **claim** about which any **insureds** first received notice prior to the inception date set forth in the Common Policy Declarations or subsequent to the expiration date set forth in the Common Policy Declarations or any effective date of cancellation. Such amount shall be subject to the Coverage Part Deductible amount set forth in the Fiduciary Liability Coverage Part Declarations and shall be part of and not in addition to the applicable Limit of Insurance set forth in the Fiduciary Liability Coverage Part Declarations.

## SECTION II - DEFINITIONS

Where set forth in bold type in this Coverage Part, whether in singular or in plural, the following terms shall have the meanings indicated.

**A. Administration** means:

**1.** Giving counsel, advice or notice to employees of the **organization**, participants or beneficiaries with respect to any **insured plan**;

**2.** Interpreting any **insured plan**;

**3.** Handling records of any **insured plan**; and

**4.** Effecting enrollment, termination, or cancellation of employees of the **organization**, participants or beneficiaries under any **insured plan**.

**B. Claim** means:

**1.** A written demand for monetary damages or non-monetary relief;

**2.** A civil proceeding commenced by the filing of a complaint or similar pleading;

**3.** A formal administrative or regulatory proceeding commenced by a filing of charges, formal investigative order or similar document;

**4.** An arbitration, mediation or similar alternative dispute resolution proceeding if the **insured** is required or agrees to participate in such proceeding, with our written consent;

**5.** A criminal proceeding commenced by the filing of charges;

**6.** A written notice of commencement of a fact-finding investigation by the U.S. Department of Labor, the Pension Benefit Guaranty Corporation or any similar governmental authority; or

**7.** A written request to toll or waive a statute of limitations relating to a potential **claim** described in Definitions **B.1.** through **B.6.** above;

against any **insured**, including any appeal therefrom.

**Claim** shall not include any internal claim or appeal process provided for in the **insured plan(s)** documents or otherwise required by law.

**ML 113 01 18**

C. **Defense costs** means reasonable and necessary fees, costs, and expenses incurred by us or with our consent on behalf of the **insureds** or reimbursed to any of the **insureds** by us, resulting solely from the investigation, adjustment, defense and appeal of any **claim**. **Defense costs** includes, but is not limited to, the cost of expert consultants and witnesses, and premiums for appeal, injunction, attachment or supersedeas bonds (but not the obligation to furnish such bonds).

   **Defense costs** shall not include:

   1. Salaries, wages, fees, overhead or expenses of our employees or any **insureds**, directors, officers, trustees or employees, other than that portion of our employed attorneys' fees, salaries and expenses allocated to a specific **claim**;

   2. Any amount covered by the duty to defend obligation of any other insurer; or

   3. Any pre-tender fees, costs or expenses.

D. **Employee pension plan** means any plan as defined in Section 3(2) of **ERISA** or any similar or related federal, state or local law or regulation.

E. **ERISA** means the Employee Retirement Income Security Act of 1974, including amendments thereto and regulations promulgated thereunder.

F. **ESOP** means any employee stock ownership plan so defined in Section 407(d)(6)(A) of **ERISA**, or any similar or related federal, state or local law or regulation.

G. **Employee welfare plan** means any plan as defined in Section 3(1) of **ERISA** or any similar or related federal, state or local law or regulation.

H. **Executive** means any natural person who was, now is or shall become the chairperson, president, chief executive officer, chief financial officer, executive director, in-house general counsel or person of equivalent position to any of the foregoing of the **organization**.

I. **Insured** means the **organization** and the **insured persons**.

J. **Insured persons** means:

   1. All natural persons who were, now are, or shall become an officer or a duly elected or appointed member of the board of directors, trustees, regents, managers, governors, or a functional equivalent thereof of the **organization** or of the **insured plan(s)**; and

   2. All natural persons who were, now are, or shall become an employee or committee member, whether or not they were, are or shall be salaried, of the **organization**;

   while acting in the capacity as a fiduciary of an **insured plan** or while performing **administration** provided such natural person is not prohibited by law from acting as a fiduciary.

K. **Insured plan** means an employee benefit plan to include:

   1. Any **employee welfare plan** which was, is now, or shall become sponsored solely by the **organization** exclusively for the benefit of employees of the **organization**;

   2. Any **employee pension plan** which was or is now sponsored solely by the **organization** exclusively for the benefit of employees of the **organization**;

   3. Any **ESOP** which was or is now sponsored solely by the **organization** exclusively for the benefit of employees of the **organization** and is disclosed as an **ESOP** in the **application**;

   4. Any **multiemployer plan** to which the **organization** was or is now required to contribute and is disclosed as a **multiemployer plan** in the **application**;

   5. Any benefits provided under workers' compensation insurance, unemployment insurance, Social Security, disability insurance, and the Consolidated Omnibus Budget Reconciliation Act of 1985 and amendments thereto which are administered by the **organization** exclusively for the benefit of employees of the **organization**; or

   6. Any other benefit plan which is operated solely by the **organization** solely for the benefit of the employees of the **organization**.

L. **Loss** means **defense costs** and the total amount of monetary damages which the **insureds** become legally obligated to pay on account of any **claim** for a **wrongful act** with respect to which coverage hereunder applies, including damages, judgments, settlements, prejudgment and postjudgment interest, and punitive or exemplary damages or the multiplied portion of any multiplied damage award if insurable under the applicable law most favorable to the insurability of punitive, exemplary or multiplied damages.

**ML 113 01 18**                                                                                             **Page 3 of 8**

**Loss** shall not include:

1. Taxes, civil or criminal fines, sanctions, liquidated damages, payroll or penalties except for:

   a. The 5% or less or 20% or less civil penalties imposed upon any of the **insureds** as a fiduciary under Sections 502(i) or 502(l), respectively, of **ERISA**;

   b. Civil money penalties imposed upon any **insured** for violation of the privacy provisions of the Health Insurance Portability and Accountability Act. The maximum Limit of Insurance for all such civil money penalties in the aggregate shall be the HIPAA Sublimit set forth in the Fiduciary Liability Coverage Part Declarations. This sublimit shall be part of and not in addition to the Limit of Insurance set forth in the Fiduciary Liability Coverage Part Declarations and does not increase our maximum aggregate liability under this Coverage Part;

   c. Civil money penalties imposed upon any **insured** under the Pension Protection Act of 2006. The maximum Limit of Insurance for all such civil money penalties in the aggregate shall be the Pension Protection Act Sublimit set forth in the Fiduciary Liability Coverage Part Declarations. This sublimit shall be part of and not in addition to the Limit of Insurance set forth in the Fiduciary Liability Coverage Part Declarations and does not increase our maximum aggregate liability under this Coverage Part;

   d. Civil money penalties imposed upon any **insured** as a fiduciary under Section 502(c) of the **ERISA**, as amended (including, any amendments pursuant to Section 507 of Title V of the Pension Protection Act of 2006). The maximum Limit of Insurance for all such civil money penalties in the aggregate shall be the ERISA 502(c) Sublimit set forth in the Fiduciary Liability Coverage Part Declarations. This sublimit shall be part of and not in addition to the Limit of Insurance set forth in the Fiduciary Liability Coverage Part Declarations and does not increase our maximum aggregate liability under this Coverage Part;

   e. Civil money penalties imposed upon any **insured** under the Patient Protection and Affordable Care Act and the Health Care and Education Reconciliation Act or any similar or related federal law or regulation. The maximum Limit of Insurance for all such civil money penalties in the aggregate shall be the Healthcare Reform Sublimit set forth in the Fiduciary Liability Coverage Part Declarations. This sublimit shall be part of and not in addition to the Limit of Insurance set forth in the Fiduciary Liability Coverage Part Declarations and does not increase our maximum aggregate liability under this Coverage Part; or

   f. The 15% or less excise tax penalty imposed under Section 4975 of the Internal Revenue Code, as amended. The maximum Limit of Insurance for all such penalties in the aggregate shall be the Section 4975 Sublimit set forth in the Fiduciary Liability Coverage Part Declarations. This sublimit shall be part of and not in addition to the Limit of Insurance set forth in the Fiduciary Liability Coverage Part Declarations and does not increase our maximum aggregate liability under this coverage part;

2. Any matter deemed uninsurable under the law pursuant to which this Coverage Part shall be construed;

3. Any amount for which the **insureds** are not financially liable whether the **insureds** are absolved from payment by any covenant, agreement, court order or otherwise;

4. Benefits due or to become due under the terms of the **insured plans** except to the extent that recovery for such benefits is based on a **wrongful act** and the payment constitutes a personal obligation of the **insured**; or

5. Payment of medical, pension and/or severance benefits which are or may become due.

M. **Multiemployer plan** means an **employee pension plan** or an **employee welfare plan** maintained pursuant to one or more collective bargaining agreements to which the **organization** and at least one other employer is required to contribute.

N. **Organization** means the **named insured**, any **subsidiary**, and the **insured plans**.

O. **Property damage** means:

1. Injury or damage, of any nature, to tangible or intangible property, including all resulting loss of use of that property; or

2. Loss of or loss of use of tangible or intangible property that is not otherwise injured or damaged.

**P. Settlement fees** means any fees, penalties or sanctions imposed by law under a **settlement program** that any **insured** becomes legally obligated to pay as a result of a **wrongful act**. The **settlement fees** shall not include any costs or expenses other than such fees, penalties or sanctions.

**Q. Settlement program** means any voluntary compliance resolution program or similar voluntary **settlement program** administered by the Internal Revenue Service or Department of Labor of the United States, including, but not limited to, the Employee Plans Compliance Resolution System, the Self Correction Program, the Audit Closing Agreement Plan, the Delinquent Filer Voluntary Compliance Program, and the Voluntary Fiduciary Correction Program, Tax Sheltered Annuity Voluntary Correction Program, Walk-in Closing Agreement Program, Voluntary Compliance Resolution Program or any similar program entered into by the **organization**.

**R. Settlement program notice** means a written notice to us by the **insured** of the **insured's** intent to enter into a **settlement program**.

**S. Wrongful act** means:

**1.** Any actual or alleged breach of fiduciary duty, neglect, error, misstatement, misleading statement, omission or other act done or wrongfully attempted by the **insureds** in the discharge of their duties solely in their capacity as:

**a.** A fiduciary of the employee benefit plan(s) (as the term fiduciary is defined in the **ERISA** and amendments thereto) in connection with the management and/or administration of any **insured plan(s)** or assets of the **insured plan(s)**;

**b.** An authorized agent of the **organization** with respect to the **administration** of any **insured plan(s)**; or

**c.** a settlor with respect to establishing, amending, funding or terminating an **insured plan**; or

**2.** Any matter claimed against any of the **insureds** solely by reason of their fiduciary capacity with any **insured plan(s)** or by reason of their capacity as authorized agent of the **organization** with respect to the **administration** of the **insured plan(s)**;

provided the breach of fiduciary duty, neglect, error, misstatement, misleading statement, omission or other act or the conduct that is the subject of such matter was committed, attempted or allegedly committed or attempted on or after the Retroactive Date, if any, and set forth in the Fiduciary Liability Coverage Part Declarations and prior to the end of the **policy period**.

---

## SECTION III - EXCLUSIONS

The descriptions in the headings of these exclusions are solely for convenience and form no part of the terms and conditions of coverage.

**A.** Bodily Injury/Property Damage

We are not liable to pay, indemnify or defend any **claim** for actual or alleged:

**1.** Bodily injury, sickness, disease, or death of any person, mental anguish, or emotional distress; or

**2. Property damage**, including, but not limited to, physical injury, loss of or loss of use of currency or any negotiable or non-negotiable instruments or contracts representing money.

**B.** Conduct

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, or in consequence of any of the **insureds** or any person for whose actions the **insureds** are legally responsible:

**1.** Committing any deliberately fraudulent act or omission;

**2.** Committing any willful violation of any statute or regulation; or

**3.** Gaining any profit, remuneration or advantage to which they were not legally entitled;

if established by a final and non-appealable judgment or adjudication in any underlying action or proceeding adverse to the **insureds** as to such conduct.

With respect to determining the applicability of this exclusion, no conduct pertaining to any **insured person** shall be imputed to any other **insured person**; however, any conduct pertaining to any **executive** shall be imputed to the **organization** to determine if coverage is available.

**C.** Contract

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, or in consequence of, or in any way involving any actual or alleged liability of any **insureds** under the terms, conditions or warranties of any oral or written contract or agreement, except to the extent:

   **1.** The liability would have attached to any such **insureds** in the absence thereof; or

   **2.** The liability was assumed in accordance with the agreement or declaration of trust pursuant to which the **insured plan** was established.

**D.** FLSA, NLRA, WARN and OSHA

We are not liable to pay, indemnify or defend any **claim** where all or part of such **claim** is based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the:

   **1.** Fair Labor Standards Act;

   **2.** National Labor Relations Act (including the Labor Management Relations Act of 1947);

   **3.** Worker Adjustment and Retraining Notification Act; or

   **4.** Occupational Safety and Health Act.

**E.** Failure to Collect Contributions or Return of Contributions (other than Defense Costs)

We are not liable to pay for or indemnify that part of **loss** other than **defense costs** based upon, arising out of, or in consequence of the failure to collect contributions owed by an employer to the **insured plan(s)** unless such failure is due to the negligence of any of the **insureds** or which constitutes the return or reversion of any contributions or assets of the sponsored **insured plan(s)** to an employer.

**F.** Other Plans

We are not liable to pay, indemnify or defend any **claim** based upon, arising out of, or in consequence of the service of any of the **insureds** as a fiduciary or administrator of any plan(s) other than an **insured plan** or the status of any of the **insureds** as a fiduciary of such other plan(s).

**G.** Wage Disputes

We are not liable to pay, indemnify or defend any **claim** where all or part of such **claim** is based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any actual or alleged:

   **1.** Calculation, timing or manner of payment of minimum wages, prevailing wage rates, overtime pay or other compensation alleged to be due and owing;

   **2.** Classification of any organization or person for wage and hour purposes, garnishments, withholdings or other deductions from wages; or

   **3.** Child labor laws, pay equity or comparable worth, or any similar policies or practices.

**H.** Workers Compensation, Unemployment, Social Security, Disability

We are not liable to pay, indemnify or defend any **claim** where all or part of such **claim** is based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any actual or alleged obligation of any **insured** under any workers' compensation, unemployment insurance, social security, disability benefits or similar law.

## SECTION IV - SEVERABILITY OF EXCLUSIONS

With respect to determining the applicability of the above exclusions, no **wrongful act** or knowledge possessed by any one of the **insureds** shall be imputed to any other **insureds** to determine if coverage is available, unless indicated otherwise.

## SECTION V - LIMIT OF INSURANCE AND DEDUCTIBLE

**A.** We will pay 100% of **loss** in excess of the Deductible amount set forth in the Fiduciary Liability Coverage Part Declarations up to the Limit of Insurance set forth in the Fiduciary Liability Coverage Part Declarations, subject to the Shared Annual Aggregate Limit of Liability, if so set forth in the Common Policy Declarations.

**ML 113 01 18**

**B.** The Deductible amount set forth in the Fiduciary Liability Coverage Part Declarations shall apply to each and every **claim**. The Deductible shall be paid by the **insureds**.

**C.** **Defense costs** shall be part of and not in addition to the Limit of Insurance set forth in the Fiduciary Liability Coverage Part Declarations and the Shared Annual Aggregate Limit of Liability, if so set forth in the Common Policy Declarations. **Defense costs** we pay shall reduce such Limits of Insurance. **Defense costs** paid by the **insureds** shall be applied against the Deductible.

**D.** Our maximum aggregate liability for all **loss** resulting from all **claims** under this Coverage Part shall be the Limit of Insurance set forth in the Fiduciary Liability Coverage Part Declarations, subject to the Shared Annual Aggregate Limit of Liability, if so set forth in the Common Policy Declarations.

**E.** If an Additional Defense Limit of Insurance is set forth in the Fiduciary Liability Coverage Part Declarations, **defense costs** will apply first to and reduce the Additional Defense Limit of Insurance. The Additional Defense Limit of Insurance will be in addition to, and not part of the Limit of Insurance set forth in the Fiduciary Liability Coverage Part Declarations. The Additional Defense Limit of Liability is applicable to **defense costs** only. **Defense costs** paid by the **insureds** shall be applied against the Deductible.

Upon exhaustion of the Additional Defense Limit of Insurance, **defense costs** shall be part of and not in addition to the Limit of Insurance set forth in the Fiduciary Liability Coverage Part Declarations. **Defense costs** we pay shall reduce the Limit of Insurance.

## SECTION VI - DEFENSE, INVESTIGATION AND SETTLEMENT

**A.** We will have the right and duty to select counsel and defend the **insureds** against any **claim**; however, we will have no duty to defend the **insureds** against any **claim** to which this insurance does not apply.

**B.** We may make any investigation we deem necessary and may, with the consent of the **insureds** named in connection with the **claim**, make any settlement of any **claim** we deem expedient. If the **insureds** withhold consent to such settlement, our liability for all **loss** in connection with such **claim** shall not exceed:

   **1.** The amount of the proposed settlement plus **defense costs** incurred up to the date of the **insured's** refusal to consent to the proposed settlement; plus

   **2.** 90% of any settlement or judgment in excess of the proposed settlement amount referenced in **B.1.** above plus 90% of any **defense costs** incurred after the date the **insureds** refused to consent to the proposed settlement, subject in all events to the applicable Limit of Insurance and Deductible for such **claim**. The remaining 10% of any settlement or judgment in excess of the proposed settlement amount referenced in **B.1.** above plus 10% of any **defense costs** incurred after the date the **insureds** refused to consent to the proposed settlement shall be borne by the **insureds**, uninsured and at their own risk.

**C.** Our right and duty to defend end when we have used up the applicable Limit of Insurance in the defense or payment of damages, judgments or settlements of covered **claims**.

## SECTION VII - FORMATION, ACQUISITION OR TERMINATION OF AN EMPLOYEE BENEFIT PLAN

**A. Acquisition or Formation of an Employee Benefit Plan**

If during the **policy period** of the applicable Coverage Part the **organization** newly acquires or forms another employee benefit plan which is then sponsored by the **organization** solely for the benefit of the employees of the **organization**, the newly acquired or formed employee benefit plan shall be deemed to be an **insured plan**. However;

   **1.** For a newly acquired or formed employee pension plan whose assets are greater than 35% of the sum of the assets all other insured plans, coverage is afforded only until the 90th day after the organization acquires or forms the entity or the end of the policy period, whichever is earlier. All newly acquired or formed employee benefit plans whose assets are less than or equal to 35% of the sum of the assets all other insured plans shall be automatically afforded coverage until the end of the policy period;

   **2.** For a newly acquired or formed ESOP or multiemployer plan, coverage is afforded only until the 90th day after the organization acquires or forms the entity or the end of the policy period, whichever is earlier. Coverage for the newly acquired or formed ESOP or multiemployer plan will not be afforded following such 90-day period unless we have agreed to provide such coverage, subject to any documentation and information that we may require, and the named insured has paid us any additional premium as we may require; and

**3.** Coverage does not apply to claims for wrongful acts committed, attempted or allegedly committed or attempted prior to the date the organization acquired or formed the employee benefit plan unless we agree, after presentation of any documentation and information that we may require, to provide coverage by endorsement for such claims and the named insured pays any additional premium we require for the endorsement.

### B. Termination of an Employee Benefit Plan

If during the **policy period** the **sponsor** terminates an **insured plan**, then, subject to all the other provisions of this policy, coverage shall continue to apply to such **insured plan** and its **insureds** until the end of the applicable **policy period** or any applicable **extended reporting period**, but only with respect to **claims** for **wrongful acts** committed, attempted or allegedly committed or attempted prior to the date such **insured plan** was terminated. The **named insured** shall give written notice to us as soon as practicable, but in no event later than 90 days after the **insured plan** is terminated.

---

## SECTION VIII - WAIVER OF RIGHT OF RECOURSE

In the event that this Coverage Part has been purchased in whole or in part by an **insured** other than an **insured plan**, it is agreed that we waive our right of recourse against such **insured** under Section 410(b)(1) of **ERISA** as amended.

This supersedes any rights to recovery contrary to the aforementioned which may be set forth in **SECTION XIV - SUBROGATION** of the **GENERAL PROVISIONS APPLICABLE TO ALL LIABILITY COVERAGE PARTS**.

---

# The Cincinnati Insurance Company

## PILLAR POLICY APPLICATION
## FOR PRIVATELY HELD COMPANIES

(other than Healthcare Institutions)

**THIS POLICY PROVIDES CLAIMS-MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD. TO THE EXTENT IT IS NOT OTHERWISE INDICATED, THE LIMIT OF INSURANCE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY DEFENSE COSTS, AND DEFENSE COSTS WILL BE APPLIED AGAINST THE DEDUCTIBLE. IN NO EVENT WILL WE BE LIABLE FOR DEFENSE COSTS OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE LIMIT OF INSURANCE. READ THE ENTIRE POLICY CAREFULLY.**

---

### General Information
### This section must be completed.

1. Name of Applicant: **Bruss Building Services Group, LLC**

2. Physical Street Address: **60 Route 103**

   City: **Sunapee**    State: **NH**    Zip: **03782**

3. Mailing Address (☒ same as physical): _____

   City: _____    State: _____    Zip: _____

4. Website: **https://relaxandcompany.com/**    Phone Number: **(603) 526-2436**

5. Year Established: **2014**

6. Nature of Business: **Property management & construction in Lake Sunapee, NH area**

7. What is the number of locations occupied by the Applicant and subsidiaries? _____

8. Does the Applicant have any subsidiaries of which their ownership or management control is greater than 50%? *If yes, please complete table below:*    ☒ Yes ☐ No

| Name of Subsidiary | Description of Operations | Year Established | Percent Owned |
|---|---|---|---|
| Sunapee Getaways | Construction | | 100 % |
| | | | % |
| | | | % |
| | | | % |

9. Please provide the following information regarding the employee count (*do not include Independent Contractors*) of the Applicant and subsidiaries:

| | Currently | One Year Ago |
|---|---|---|
| **Full-Time Employees** | 76 | 51 |
| **Part-Time Employees** | 8 | 11 |
| **Temporary/Seasonal** | 7 | |

ML 008 A 01 18

Page 1 of 8

## Coverages Requested
### This section must be completed.

1. Requested effective date of coverage (if known): _7·1·2024_

2. Please indicate coverage(s) desired in the table below:

| Coverage Part | Desired Limits | Desired Deductible |
|---|---|---|
| ☒ Directors and Officers Liability | $ 1/1M; 2M/2M; 3M/3M | $ 5,000 |
| ☐ Employment Practices Liability | $ | $ |
| ☐ Fiduciary Liability | $ | $ |
| ☐ Cyber | Complete Cyber Section on Page 4. | |
| ☐ Crime | Complete Crime Section on Page 5. | |

3. Desired Pay Plan:

| Installment Options | Agency Bill | Direct Bill |
|---|---|---|
| Annual | ☐ | ☒ |
| Semi-Annual | ☐ | ☒ |
| Quarterly | ☐ | ☒ |
| Monthly | N/A | ☐ |

## Directors & Officers Liability Coverage
### This section should only be completed if coverage is desired.

1. Complete the following table for any shareholder with ownership of 10% or more:

| Shareholder | Percent Owned | | Director or Officer? |
|---|---|---|---|
| James Bruss | 95 | % | ☒ Yes ☐ No |
| Gina Bruss | 5 | % | ☒ Yes ☐ No |
| | | % | ☐ Yes ☐ No |
| | | % | ☐ Yes ☐ No |

2. Total percentage of voting shares owned by the directors and officers of the Applicant: _100_ %

3. Total number of shareholders: _2_

4. Does the charter or by-laws provide indemnification to its directors and officers as permitted by law?  ☐ Yes ☐ No

5. Does the Applicant have a formal Conflict of Interest Policy?  ☒ Yes ☐ No

6. Has the Applicant or any subsidiary completed or been involved in the following: *If yes, please attach details.*

| | In the past 3 years | Contemplating in the future |
|---|---|---|
| Actual or proposed merger, acquisition, tender offer, consolidation, closing, purchase/sale of assets, divestment or sale of more than 10% of its total stock holdings? | ☐ Yes ☒ No | ☒ Yes ☐ No |
| Offering of securities of any kind (including stocks or bonds)? | ☐ Yes ☒ No | ☒ Yes ☐ No |
| Reorganization, bankruptcy proceeding or material change in any arrangement with creditors? | ☐ Yes ☒ No | ☐ Yes ☒ No |
| Operations outside of the United States of America, Puerto Rico and Canada? | ☐ Yes ☒ No | ☒ Yes ☐ No |

7. In the past 5 years, has the Applicant or any subsidiary completed or been involved in the following: *If yes, please attach details.*

   a. Shareholder's suit, shareholder derivative suit or class action suit?  ☐ Yes ☒ No
   b. Copyright, patent or other intellectual property litigation?  ☐ Yes ☒ No
   c. Antitrust litigation?  ☐ Yes ☒ No
   d. Breach of any debt covenant, loan agreement or contractual obligations?  ☐ Yes ☒ No

8. Is Employed Lawyers Professional Liability Coverage desired?  ☐ Yes ☒ No
   *If yes, please complete supplemental questionnaire ML 023 A.*

ML 008 A 01 18

Page 2 of 8

---

### Employment Practices Liability Coverage
This section should only be completed if coverage is desired.

---

1. List the Applicant's total number of employees in the following locations:

CA: n/a          WV: n/a          Foreign Countries: n/a

2. Please indicate the number of employee terminations in the table below:

|  | Last 12 Months | Previous 12 Months |
|---|---|---|
| **Voluntary** | 19 | |
| **Involuntary** (excluding layoffs) | 12 | |
| **Layoffs** | 0 | |

3. Have there been any layoffs in the last 24 months? *If yes, complete 3.a.-3.c.*  ☐ Yes ☑ No

   a. Was a severance package available to the affected employees?  ☐ Yes ☐ No

   b. Was a signed release required to receive a severance package?  ☐ N/A ☐ Yes ☐ No

   c. Did anyone refuse to sign the severance package release?  ☐ N/A ☐ Yes ☐ No

4. Do you anticipate any layoffs in the future? *If yes, please provide complete details.*  ☐ Yes ☑ No

5. How many of the Applicant's employees receive a salary of $100,000 or more?  8

6. Does the Applicant have a human resources department or manager?  ☑ Yes ☐ No

7. Does the Applicant distribute an employee handbook to all employees?  ☑ Yes ☐ No

8. Does the Applicant have written guidelines, procedures or training for the following:

   a. Grievances  ☑ Yes ☐ No

   b. Performance evaluations  ☑ Yes ☐ No

   c. Sexual/Workplace harassment  ☑ Yes ☐ No

   d. FMLA  ☑ Yes ☐ No

   e. Hiring/Interviewing  ☑ Yes ☐ No

   f. Terminations  ☑ Yes ☐ No

   g. Discipline  ☑ Yes ☐ No

   h. Discrimination  ☑ Yes ☐ No

   i. Workplace violence  ☑ Yes ☐ No

   j. Potentially hostile situations  ☑ Yes ☐ No

9. Does the Applicant provide Employee Assistance Programs to all Employees?  ☑ Yes ☐ No

10. Is Third Party Liability Coverage desired? *If yes, complete 10.a.-10.d.*  ☐ Yes ☑ No

   a. Are there written policies and procedures regarding the conduct of employees when interacting with third parties (customers, vendors, visitors, independent contractors and other third parties)?  ☐ Yes ☐ No

   b. What percent of employees deal with the general public?  _____ %

   c. Does the Applicant have Independent Contractors that are used on a regular basis?  ☐ Yes ☐ No

     *If yes, how many?*

   d. Is the Applicant's website compliant with the Web Content Accessibility Guidelines (WCAG)?  ☐ Yes ☐ No
    *If no, please advise time frame in which the website will be compliant.*

---

ML 008 A 01 18

Page 3 of 8

## Fiduciary Liability Coverage
### This section should only be completed if coverage is desired.

1. Complete the table below for any employee benefit plan(s) sponsored by the Applicant and its subsidiaries:

| Plan Name | Year Established | Total Plan Assets | Plan Type* (DC, DB or ESOP) | Number of Participants |
|---|---|---|---|---|
| 401k Plan | 2024 | $ 0 | DC | 83 |
| | | $ | | |
| | | $ | | |

*Plan Type: DC-Defined Contribution, DB-Defined Benefit, ESOP-Employee Stock Ownership Plan

2. Are the plan(s) listed above audited by a CPA? ☑ Yes ☐ No

3. Are any of the above plan(s) frozen? (*If yes, please provide details.*) ☐ Yes ☑ No

4. If any plan is a Multi-Employer Plan, does the Applicant administer the entire plan? ☐ N/A ☑ Yes ☐ No

5. What is the funding percentage for the Applicant's defined benefit retirement plan(s)? ☐ N/A  3.5 %

6. Does any plan provide the option to invest in securities of the Applicant or any subsidiary? ☐ Yes ☑ No

7. Please answer the following regarding any ESOP and/or KSOP and attach the most recent plan valuation: ☑ N/A

   a. When was the plan last appraised? _____

   b. What was the share value? Current Year $ _____ One Year Ago $ _____

8. Are employee benefit plans reviewed periodically to ensure there are no violations of ERISA including, but not limited to, compliance with eligibility, participation, vesting or other provisions? *If no, please attach complete details.* ☑ Yes ☐ No

9. In the past 3 years, regarding their employee benefit plans, has the Applicant or any subsidiary: *If yes, please attach complete details.*

   a. Received an adverse opinion on financial condition? ☐ Yes ☑ No

   b. Reduced benefits, merged, terminated, restructured or have plans to do so? ☐ Yes ☑ No

   c. Been assessed fees, fines or penalties, under any voluntary compliance resolution program or voluntary settlement program? ☐ Yes ☑ No

   d. Been investigated by the IRS, DOL or other governmental authority? ☐ Yes ☑ No

## Cyber Coverage
### This section should only be completed if coverage is desired.

Indicate below if either of the following Cyber options is desired. *Please note that both options cannot be selected.*

☐ Option 1 - **Cincinnati Data Defender™** and/or **Cincinnati Network Defender™** - Please check desired coverages, if any. *If higher limits are desired, please complete supplemental questionnaire ML 002.*

| Cincinnati Data Defender™ | ☐ | | Cincinnati Network Defender™ | ☐ |
|---|---|---|---|---|
| Response Expenses Limit | $50,000 | | Computer Attack Limit | $100,000 |
| Defense and Liability Limit | $50,000 | | Network Security Liability Limit | $100,000 |
| Identity Recovery Limit | $25,000 | | | |

☐ Option 2 - **Cincinnati Cyber Defense™** - Application **ML 004** must be completed if this coverage is desired.

ML 008 A 01 18

Page 4 of 8

**Crime Coverage**
This section should only be completed if coverage is desired.

1.

| Requested Insuring Agreements | Limit of Insurance | Deductible Amount |
|---|---|---|
| Employee Theft  ☐ Include ERISA  ☐ ERISA Only | $ | $ |
| Forgery or Alteration  ☐ Include Credit/Debit Card Forgery | $ | $ |
| Inside the Premises | $ | $ |
| Outside the Premises | $ | $ |
| Computer Fraud | $ | $ |
| Funds Transfer Fraud | $ | $ |
| Money Orders and Counterfeit Money | $ | $ |
| Clients' Property | $ | $ |
| Claim Expense | $ | $ |
| Social Engineering Fraud Endorsement | $ | $ |

2. Name of employee benefit plan(s) to be included for coverage, if any: _____

3. Please complete the table below with regard to classification of employees of the Applicant and subsidiaries:

| Employee Classifications | Total Number |
|---|---|
| Officers and employees who handle, have custody of or maintain records of money, securities or other property (including that of ERISA plans). | 8 |
| All other employees not included above. | 83 |

4. If Credit/Debit Card Forgery is desired, what is the number of cardholders? _____

5. Does the Applicant perform regular audits? *If yes, complete 5.a. and 5.b.*  ☐ Yes ☐ No

   a. By whom? _____

   b. How frequently? _____

6. Please answer the following regarding the Applicant's and subsidiaries' internal controls:

   a. Are bank statements reconciled at least monthly?  ☑ Yes ☐ No

   b. Are accounts reconciled by someone not authorized to withdraw and deposit?  ☑ Yes ☐ No

   c. Are countersignatures required?  ☐ Yes ☑ No

      *If yes, for checks over what amount? $* _____

   d. Is there a fraud policy and procedure in place?  ☑ Yes ☐ No

   e. Are criminal histories reviewed in the hiring/screening process?  ☑ Yes ☐ No

   f. Are all employees who handle or maintain records of money or securities required to take annual leave of at least 5 consecutive days?  ☑ Yes ☐ No

   g. Are the same internal controls in place at all locations?  ☐ N/A ☑ Yes ☐ No

   h. Are there regular physical inventories made?  ☐ N/A ☑ Yes ☐ No

   i. Are deposits made on a daily basis?  ☐ N/A ☑ Yes ☐ No

*Only complete questions 7-15 if Computer Fraud, Funds Transfer Fraud or Social Engineering Fraud coverage is desired.*

7. Does the Applicant use electronic wire transfers? *If yes, complete 7.a.-7.c.*  ☐ N/A ☑ Yes ☐ No

   a. Approximately how many transfers do they process per month?  20 +

   b. What is the average dollar amount of each transfer?  $ 20,000.

   c. What is the maximum dollar amount for a single transfer?  $ 200,000.

8. Does the Applicant require dual authorization for all wire transfers?  ☐ N/A ☐ Yes ☑ No

ML 008 A 01 18

9. Are the Applicant's computer systems protected by the following:

    a. Firewall? ☑ Yes ☐ No

    b. Intrusion detection software? ☑ Yes ☐ No

    c. Antivirus software? ☑ Yes ☐ No

    d. Software system to detect fraudulent computer usage? ☐ Yes ☑ No

10. Are passwords and access codes changed at regular intervals and when users are terminated? ☑ Yes ☐ No

11. Does the Applicant give vendors access to their proprietary systems or databases? ☐ Yes ☑ No

12. Has an internal EDP security audit been conducted in the last year? ☐ Yes ☑ No

    *If yes, have deficiencies been corrected?* ☑ N/A ☐ Yes ☐ No

13. Does the Applicant accept funds transfer instructions from customers over the phone, email, text message or other similar method of communications? *If yes, do you authenticate the instructions prior to processing:* ☑ Yes ☐ No

    a. Call the customer at a predetermined number? ☐ Yes ☐ No

    b. Send a text message to a predetermined number? ☐ Yes ☐ No

    c. Require a receipt of a code known only by the customer to confirm identity? ☐ Yes ☐ No

    d. Some other method or combination of the above? ☐ Yes ☐ No

14. For internal transactions, is there a record kept of the verification process and is it conducted by someone other than the person receiving the transfer request before the transfer is completed? ☐ Yes ☐ No

15. When a vendor or supplier requests any changes to their account details (including, but not limited to bank routing number, account numbers, telephone number, or contact information), does the Applicant:

    a. Confirm all requests by a direct call to the vendor or supplier using only a contact number provided by the vendor or supplier before the request was received? ☐ Yes ☐ No

    b. Send notice of receipt of the requests to someone other than the person who sent the request before making the change? ☐ Yes ☐ No

---

### Crime Expanded Coverage
This section should only be completed if coverage is desired.

1. Please check one of the following in the table below if either Crime Expanded Coverage (XC®) or Crime Expanded Coverage Plus (XC+®) is desired. The limits and coverages in Crime XC and Crime XC+ are excess of any other crime forms forming part of the same policy, if any.

| Insuring Agreements | ☐ Crime XC | ☐ Crime XC+ |
|---|---|---|
| Employee Theft | $10,000 | $25,000 |
| Forgery or Alteration | $2,500 | $25,000 |
| Inside the Premises | $10,000 | $25,000 |
| Outside the Premises | $2,500 | $5,000 |
| Money Orders and Counterfeit Money | $10,000 | $25,000 |

---

### History
This section must be completed.

1. Regarding any coverage being requested, in the past 3 years, has the Applicant or any subsidiary:
*If yes, please provide details.*

    a. Had any claim or notice of circumstance which could give rise to a claim reported to any current or previous carrier? *If yes, attach loss runs.* ☐ Yes ☑ No

    b. Been made aware of any fact, circumstance or situation which may result in a claim being filed against the Applicant for this insurance? ☐ Yes ☑ No

---

ML 008 A 01 18

Page 6 of 8

## Prior Coverage
### This section must be completed.

1. Please complete the table below with regard to prior coverage:

| Coverage | None | Insurer | Limits | Deductible | Premium |
|---|---|---|---|---|---|
| Directors & Officers Liability | ☒ | | $ | $ | $ |
| Employment Practices Liability | ☐ | | $ | $ | $ |
| Fiduciary Liability | ☐ | | $ | $ | $ |
| Cyber | ☐ | | $ | $ | $ |
| Crime | ☐ | | $ | $ | $ |

2. Has any application for similar insurance been declined or any policy cancelled in the past 5 years?    ☐ Yes ☐ No
   (This question is not applicable in Missouri.)

## Required Attachments

- Most Recent Annual Financial Statements *(CPA Audit, if available)*
- Current List of Directors & Officers *(if requesting Directors & Officers Liability)*
- Employee Handbook *(if requesting Employment Practices Liability)*
- Blank Employment Application *(if requesting Employment Practices Liability)*
- Most Recent IRS Form 5500 for each employee benefit plan *(if requesting Fiduciary Liability)*
- If continuity of coverage is desired, please include 5 year loss runs and previous declarations page(s)

## Prior Knowledge/Representation Declarations
### This section must be completed.

1. Has the applicant given written notice under any prior policy(ies) (with coverage similar to what is being applied for under this application) of specific facts or circumstances which might give rise to a claim, which would have fallen within the scope of such insurance, against any insured proposed for insurance under this application?
   *If yes, provide details below:*    ☐ Yes ☒ No

   _____

   _____

2. Is any person proposed for this insurance cognizant of any act, error, or omission which he/she has reason to suppose might afford valid grounds for any future claim such as would fall within the scope of the proposed insurance?
   *If yes, provide details below:*    ☐ Yes ☒ No

   _____

   _____

No fact, circumstance or situation indicating the probability of a claim or action against which indemnification would be afforded by the proposed insurance is now known by any person(s) or entity(ies) proposed for this insurance other than that which is disclosed in this application. It is agreed by all concerned that if there be knowledge of any such fact, circumstance, or situation, any claim subsequently emanating therefrom shall be excluded from coverage under the proposed insurance.

The undersigned authorized agent of the person(s) and entity(ies) proposed for this insurance for the purpose of this application represents that to the best of his knowledge the statements herein are true; and it is agreed that this application shall be the basis of the contract and be incorporated therein should the insurer evidence its acceptance of this application by issuance of a policy. This application will be attached to and will become part of such policy, if issued.

ML 008 A 01 18

**Page 7 of 8**

bates p. 101

```
┌─────────────────────────────────────────────────────────────────────────────┐
│                           Signature Section                                    │
│                      This section must be completed.                           │
└─────────────────────────────────────────────────────────────────────────────┘
```

The Cincinnati Insurance Company is hereby authorized to make any investigation and inquiry in connection with this application as it deems necessary.

The undersigned authorizes the release of claim information from any prior insurer to The Cincinnati Insurance Company. Signing this application does not bind the Applicant or The Cincinnati Insurance Company to complete the insurance.

PLEASE REVIEW CAREFULLY. Except to such extent as may be otherwise in the policy, the policy for which this application is being made is limited for ONLY CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED WHILE THE POLICY IS IN FORCE.

_____       7.9.2024 / 9.11.24
**Applicant's Signature (President, Chairperson, or Equivalent Position)**     **Date**

James Bonos
_____       Owner
**Printed Name**                                       **Title**


# Tyler Halstead

Digitally signed by Tyler Halstead
Date: 2024.07.01 13:45:40 -04'00'          7/1/2024

_____       _____
**Agent's Signature**                                  **Date**

The Rowley Agency
_____       _____
**Agency Name**                                        **Agency Code Number**



_____
**Agent's Name and License Number (Florida only)**


Refer to the following page for the current version of ACORD 63 FRAUD STATEMENTS.


ML 008 A 01 18                                                    Page 8 of 8

ACORD®

**FRAUD STATEMENTS**

AGENCY CUSTOMER ID: _____

| AGENCY | CARRIER | NAIC CODE |
|--------|---------|-----------|
| | | |

| POLICY NUMBER | EFFECTIVE DATE | APPLICANT / NAMED INSURED |
|---------------|----------------|---------------------------|
| | | |

### Applicable in AL, AR, DC, LA, MD, NM, RI and WV
Any person who knowingly (or willfully)* presents a false or fraudulent claim for payment of a loss or benefit or knowingly (or willfully)* presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.  *Applies in MD Only.

### Applicable in CO
It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company.  Penalties may include imprisonment, fines, denial of insurance and civil damages.  Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

### Applicable in FL and OK
Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony (of the third degree)*.  *Applies in FL Only.

### Applicable in KS
Any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written, electronic, electronic impulse, facsimile, magnetic, oral, or telephonic communication or statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act.

### Applicable in KY, NY, OH and PA
Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties (not to exceed five thousand dollars and the stated value of the claim for each such violation)*.  *Applies in NY Only.

### Applicable in ME, TN, VA and WA
It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company.  Penalties (may)* include imprisonment, fines and denial of insurance benefits.  *Applies in ME Only.

### Applicable in NJ
Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

### Applicable in OR
Any person who knowingly and with intent to defraud or solicit another to defraud the insurer by submitting an application containing a false statement as to any material fact may be violating state law.

### Applicable in PR
Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties.  Should aggravating circumstances [be] present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.

_____   7·7·2024
APPLICANT'S SIGNATURE                    DATE (MM/DD/YYYY)

ACORD 63 (2016/10)

© 1997-2016 ACORD CORPORATION.  All rights reserved.
The ACORD name and logo are registered marks of ACORD

bates p. 103

Current List of Directors & Officers                          7/8/2024

James Bruss (Owner)

Gina Bruss (Owner)

Malarie Starcher – President

Christy Carafa – Director of Customer Experience and Sales

Laura Raymond – Construction Executive

Meghan Smith – Customer Relationship Manager

Meredith Moran – Senior Relationship Manager

Samantha Bailey – Executive Daycare Director

Kelly Bernaiche – Controller

Jake Jekubovich – Safety & Fleet Manager

Jared Raymond – Senior Project Manager

**bates p. 104**

Docusign Envelope ID: ADBDEC36-2C32-4FC8-8B68-CB2CF9CFCB55

| Named Insured | Bruss Building Services |
|---|---|
| Policy Number | EMP 072 63 42 |

# WARRANTY STATEMENT

This warranty statement applies to the Coverage Part as indicated by ☒ below:

☐    **BANKERS PROFESSIONAL LIABILITY COVERAGE**
☐    **CINCINNATI CYBER DEFENSE™ COVERAGE**
☐    **CINCINNATI DATA DEFENDER™ COVERAGE**
☐    **CINCINNATI NETWORK DEFENDER™ COVERAGE**
☐    **COMMUNITY ASSOCIATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
☐    **EDUCATORS LEGAL LIABILITY COVERAGE**
☒    **EMPLOYMENT PRACTICES LIABILITY COVERAGE**
☐    **FIDUCIARY LIABILITY COVERAGE**
☐    **FINANCIAL INSTITUTIONS DIRECTORS AND OFFICERS LIABILITY COVERAGE**
☐    **HEALTHCARE INSTITUTIONS DIRECTORS AND OFFICERS LIABILITY COVERAGE**
☐    **NONPROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY COVERAGE**
☐    **PRIVATELY HELD COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**
☐    **PUBLICLY TRADED COMPANY DIRECTORS AND OFFICERS LIABILITY COVERAGE**
☐    **TRUST SERVICES ERRORS AND OMISSIONS COVERAGE**

This warranty statement accompanies a request for additional coverage or an increase to the limit of insurance on a Coverage Part currently in force under the policy indicated above.  Regarding such request, the undersigned authorized agent of the person(s) and entity(ies) proposed for this insurance warrants the following as indicated by ☒ below (choose one):

☒    No fact, circumstance or situation indicating the probability of a claim or action against which coverage would be afforded in the Coverage Part indicated above is now known by any person(s) or entity(ies) who are or shall be insureds in the Coverage Part indicated above.

☐    Facts, circumstances or situations indicating the probability of a claim or action against which coverage would be afforded in the Coverage Part indicated above are known by any person(s) or entity(ies) who are or shall be insureds in the Coverage Part indicated above and the details are attached to this warranty statement.

The undersigned authorized agent of the person(s) and entity(ies) for whom coverage under this policy would be afforded warrants that to the best of his knowledge that the statements herein are true.  It is understood and agreed that if knowledge of any fact, circumstance, or situation, about any claim subsequently arises therefrom, coverage shall be excluded in the Coverage Part indicated above.

It is further understood and agreed that this warranty statement applies as indicated by ☒ below (choose one):

☐    The Coverage Part indicated above is an additional coverage not previously included on this policy, and this warranty statement applies to the entire limit of insurance.

☒    The Coverage Part indicated above was previously included on this policy, and this warranty statement pertains only to the limit of insurance in excess of the limit of insurance in force immediately prior to the increase in limit of insurance to which this warranty statement shall apply.

DocuSigned by:

*Jim Bruss*

**Authorized Agent (President, Chairperson or Equivalent Position)**

Jim Bruss

**Printed Name**

9/25/2024

**Date**

President

**Title**

All other provisions of the policy remain unchanged except as herein expressly modified.

**ML 419 01 16**

bates p. 105